Sallie M. HADNOTT, Reverend William McKinley Branch, Jack Drake, John Henry Davis, Robert P. Schwenn, Thomas Wrenn, Dr. John L. Cashin, Jr., and the National Democratic Party of Alabama, a corporation, for themselves jointly and severally, and for all others similarly situated, Plaintiffs,

United States of America, Amicus Curiae and Party,

v.

Mabel S. AMOS, as Secretary of State of Alabama, et al., Defendants,

Edward F. Mauldin, as Chairman of Alabama Citizens for Humphrey-Muskie, for himself and all others persons similarly situated, Defendant-Intervenor.

Emmett F. HILDRETH, Complainant-Respondent,

v.

Mabel S. AMOS, in her capacity as Secretary of State of the State of Alabama, J. Dennis Herndon, in his capacity as Probate Judge of Greene County, Alabama, R. J. Westbrook, in his capacity as Probate Judge of Marengo County, Alabama, W. E. Dearman, in his capacity as Probate Judge of Sumter County, Alabama, Defendants,

and

Jack Drake, Defendant-Petitioner.

Civ. A. Nos. 2757-N, 3171-N.

United States District Court, M. D. Alabama, N. D.

Oct. 19, 1970.

Charles Morgan, Jr., Reber F. Boult, Jr., Norman Siegel, ACLU, Atlanta, Ga., Orzell Billingsley, Jr., Birmingham, Ala., and George W. Dean, Jr., Destin, Fla., for plaintiffs.

Jerris Leonard, Asst. Atty. Gen., Civil Rights Division, U. S. Dept. of Justice, Craig M. Crenshaw, Atty., Civil Rights Division, U. S. Dept. of Justice, Washington, D. C., and Ira DeMent, U. S. Atty., Montgomery, Ala., for United States.

MacDonald Gallion, Atty. Gen., of Alabama, John Bookout, William N. McQueen, Leslie Hall and Gordon Madison, Asst. Attys. Gen. of Alabama, Montgomery, Ala., for defendants Amos, Grouby and other Probate Judges, Governor Brewer and MacDonald Gallion.

L. Drew Redden, Rogers, Howard, Redden & Mills, Birmingham, Ala., for defendant Amos.

Perry Hubbard, Tuscaloosa, Ala., for defendants Herndon, Lee and Yarbrough.

Ralph Banks, Eutaw, Ala., for defendants Seale, Henderson, Carpenter, Drummond, Gould and Owens.

R. Clifford Fulford, Levine, Fulford & Pope, Birmingham, Ala., for defendant-intervenor Mauldin. In Civ.A. No. 2757–N.

R. Clifford Fulford, Levine, Fulford & Pope, Birmingham, Ala., for complainant-respondent Hildreth.

MacDonald Gallion, Atty. Gen. of Alabama, Leslie Hall and Gordon Madison, Asst. Attys. Gen. of Alabama, Montgomery, Ala., and Perry Hubbard, Tuscaloosa, Ala., for defendants.

Charles Morgan, Jr., Reber F. Boult, Jr., Norman Siegel, ACLU, Atlanta, Ga., Orzell Billingsley, Jr., Birmingham, Ala., and George W. Dean, Jr., Destin, Fla., for defendant-petitioner Drake. In Civ. A. No. 3171–N.

Before GODBOLD, Circuit Judge, and JOHNSON and PITTMAN, District Judges.

GODBOLD, Circuit Judge:

The numerous issues in these consolidated cases concern elections and voting.

In Hadnott v. Amos, No. 2757–N, plaintiffs challenge the action of Mabel S. Amos, as Secretary of State of the State of Alabama, in accepting for filing, for use on election ballots, party emblems that are so like the emblem earlier filed by the predominantly black National Democratic Party of Alabama (NDPA) as to be likely to mislead the voters. The plaintiffs also challenge as unconstitutional provisions of the Alabama Constitution and Alabama statutes requiring that a state circuit judge must have resided in the circuit for which he is elected for one year preceding his election, and assert that if this residence requirement is constitutional Jack Drake, a candidate for circuit judge in the Seventeenth Judicial Circuit of Alabama on the NDPA ticket, has complied with it and is entitled to have his name appear on the ballot in the Alabama general election to be held on November 3, 1970. They challenge the failure of the Board of Registrars of Greene County to register Drake as a voter in that county, and question the constitutionality of the residence requirements for voters provided by the Alabama Constitution and statute. They ask that if Drake is not allowed to appear on the ballot for reasons relating to residence, no person in the counties composing the Seventeenth Judicial Circuit be allowed on the poll list or be allowed to vote by absentee ballot until it is determined that he has "indicia of residence" in compliance with Alabama law and greater than the "indicia of residence" possessed by Drake.

Hildreth v. Amos, No. 3171–N, was removed to this court from state court.[1] The plaintiff is the incumbent circuit judge of the Seventeenth Judicial Circuit and is the candidate of the Democratic Party for reelection. He seeks to have Jack Drake barred from the ballot as a candidate for the circuit judgeship in the November 3 general election on the grounds that he has not met the one-year residence requirement, that he is not a registered voter, and has failed to comply with the Alabama Corrupt Practices Act relating to filing of a designation of his finance committee. The probate judges of the three counties in the circuit are responsible for preparation of the ballot for their respective counties. Judge Hildreth asks that we restrain them from putting Drake's name on the ballot.

At the threshold, we dismiss the action as to Edward F. Mauldin, who was an intervenor in earlier proceedings in No. 2757–N but is not involved in matters now before us.

### I. Party emblems.

The preparation and filing of political party emblems to be used on the ballot is governed by Tit. 17, § 149, Code of Alabama:[2]

*Party emblem on ballots.*—Each political party shall, by its state party convention or state executive committee, adopt, prepare, and file with the secretary of state, at least sixty days before each election for state officers, by engraving or otherwise, at least one hundred and fifty copies of an emblem to be printed at the top of the column of such ballot assigned to such party, as a distinctive and characteristic heading thereof; and such emblem shall not be more than one inch and a half square. No party shall adopt an emblem similar in appearance to an emblem already adopted by another political party or organization, and the secretary of state shall, upon the pres-

entation or offer to him of any emblem which in his opinion is so like any other emblem already filed as to be likely to mislead any voter, forthwith notify the committee or any officer thereof or any person sending or offering such emblem of such similarity or resemblance, and shall require such party, organization, or committee to adopt, prepare, and file another emblem. The emblem once adopted, prepared, and filed as aforesaid, shall continue the emblem of the party adopting the same until it is changed by the same or like authority as prepared, adopted, and filed the original emblem, and the changed emblem as prepared and adopted, is filed and accepted by the secretary of state as in case of the original emblem.

The emblem must be "distinctive and characteristic," and it must not "mislead any voter."

At a date not clearly shown, but apparently in 1968, the Secretary of State accepted for filing and for use on the ballot the emblem of the Alabama Conservative Party. It depicted a light-colored bird, at least to some degree stylized rather than literal in depiction, standing upright with wings outstretched, holding in claws and beak a streamer saying "We dare defend our rights." There has been considerable doubt about the bird's genealogy. By some persons it has been considered an eagle, by others a dove or a pigeon. It has even been suggested that it is a short-legged chicken. Whatever its ancestry, it was gentle, conservative and peaceful in demeanor, more likely to be bearing an olive branch than a militant slogan.

In 1968, and at a date apparently later than the filing by the Alabama Conservative Party of its emblem, the NDPA sought to file as its emblem a circular seal around the outer rim of which was the party name. Within the circle was a long-eared donkey, with head, ears and

1. The Fifteenth Judicial Circuit, in Montgomery.

2. All references to the Alabama Code are to the Code of 1940 (1958 Recompilation).

tail erect and standing on all four legs. The donkey was three-dimensional in effect, with a dark or shaded body, and wore a blanket with the letter "D" thereon. Previously the Alabama Independent Democratic Party (supporting the Humphrey-Muskie presidential ticket) had filed an emblem employing a donkey. Its emblem was not in the form of a seal. The donkey was in one dimensional outline with no markings or shading. It was standing on its forelegs and kicking with its hind legs. Its short ears were laid back and its tail down. Alongside it was the slogan "Progress for America." The NDPA and Alabama Independent Democratic donkeys were not even remotely similar except that both were recognizable as donkeys.

Secretary of State Amos rejected the NDPA emblem on the ground that it "would lead to much confusion among the voters of this State." In so doing she noted that the Attorney General of Alabama had pointed out to her the statutory test of whether it was likely to mislead *any* voter.

The NDPA then adopted its present emblem, which consists of an eagle in a circle, around the rim of which appears the party name. The eagle is in flight, with wings, head and tail extended, dark of body, light of head and beak. Its demeanor is not gentle—in fact it appears to be pouncing on prey. The Secretary of State accepted the emblem, and the party used it in the 1968 election and since then. There is no evidence that the Alabama Conservative Party ever complained of similarity between the NDPA eagle and its earlier bird.

In March, 1970 the Alabama Conservatives sought to clarify the uncertain ancestry of their particular fowl by filing a new emblem which made it trimmer and slimmer, eliminated its dovelike breast, wings and visage, and substituted eagle-like parts and a stern and commanding demeanor, and made it more stylized. Whatever it was originally it now is unmistakably an eagle.

In August, 1970 the Alabama Independent Party filed its emblem, a flying eagle, with outstretched wings, dark of body and light of head, less literal than the NDPA bird but unmistakably an eagle. It is in flight just above a pedestal, or a capital "I," bearing the letters "AIP." In oral argument of this case there were differences of view among counsel over whether the bird is ascending or descending, and this court is not able to say. This emblem too was accepted by the Secretary of State.

The NDPA protested against approval of the restyled Alabama Conservative bird and the new AIP eagle.

This court has judicial knowledge of the long established custom and practice in this state of political parties employing their emblems to identify themselves, and using their emblems to simplify the voting process. For many years, so long that no member of the court knows when it began, the Democratic Party in Alabama has employed a rooster symbol, and "Vote under the Rooster" is a familiar campaign phrase. The Republican Party has employed the elephant in the same manner, and now the NDPA has sought to popularize "Vote the Eagle."

Alabama allows straight ticket voting. By throwing a single switch on the voting machine, located beneath the party emblem, or, on the paper ballot, by placing a single "X" in a small circle underneath the party emblem, the voter casts his vote for all the candidates of that party. Thus, the emblem is of major significance to each party in seeking straight ticket voting and to every voter who wishes to vote the straight ticket.

Moreover, the party emblem is of particular importance to the voter who is less schooled, or even illiterate. Neither Mrs. Amos nor the representative of the Attorney General of Alabama who advised with her about the eagles considered the possibility of the multiplicity of eagles misleading illiterate voters. The conclusion of the Secretary of State on the NDPA donkey emblem was based on two elements—the use of the likeness of the donkey and the use in both emblems of the word "Democratic." The

second aspect is not present with respect to the eagle emblems. Nevertheless, it is the symbol and not the words which we consider to be of overriding importance. There are too many other animals in the menagerie, and a limitless number of non-animal symbols in the scope of human ingenuity, to permit voter uncertainty and confusion over whose animal is whose.[3]

We conclude that the Secretary of State, in rejecting the NDPA donkey emblem in 1968 because of a preexisting donkey emblem, and in accepting the Alabama Conservative and Alabama Independent eagle emblems in 1970 in spite of the preexisting NDPA eagle emblem, applied discriminatory standards and thereby violated the provisions of the Fourteenth Amendment to the Constitution of the United States which guarantee equal protection of the laws to all citizens. *See* Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

Because of the necessity that the Alabama Conservative and the Alabama Independent parties have an opportunity to file new emblems if they wish, and the urgency of prompt printing of campaign advertising matter and of ballots, this court already has entered an order granting relief on this issue.

## II. The constitutionality of residence requirements for voters.

On July 20, 1970 Drake applied to the Board of Registrars of Greene County to be registered as a voter. The registrars accepted his application and told him there was a question about his being a resident, but have not granted or specifically denied him registration. However, their failure to act on his application amounts to a refusal. The explanation that he failed to come to a meeting of the Board of Registrars to inquire about his application is a transparent evasion.

Amendment 207 to the Alabama Constitution and Tit. 17, § 12, Code of Alabama, limit the franchise to those who

shall have resided in the state at least one year, in the county one year, and in the precinct or ward three months, immediately preceding the election at which he offers to vote, and who shall have been duly registered as an elector * * *.

Drake has met the state residency requirements. We discuss in part III of this opinion that Drake has not acquired a domicile in Greene County. Thus we consider the constitutional validity of the county and precinct requirements, which Drake questions on behalf of himself and the class composed of potential registrants similarly situated.

The cherished right to vote is characterized by the Supreme Court as a right "close to the core of our constitutional system". Carrington v. Rash, 380 U.S. 89, 96, 85 S.Ct. 775, 780, 13 L.Ed.2d 675, 680 (1965). As far back as 1886, the Court considered the right to equal voting as being "regarded as a fundamental political right, because preservative of all rights". Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220, 226 (1886). More recently, the Court spoke of the right with the same emphasis: "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481, 492 (1964). And in one of the landmark decisions of this century, Chief Justice Warren spoke for the Court:

Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement

---

3. At this juncture it appears that the November ballot will include Democratic rooster, Republican elephant, Prohibition camel, NDPA eagle, and a Whig collie which looks suspiciously like Lassie.

of the right of citizens to vote must be carefully and meticulously scrutinized.

Reynolds v. Sims, 377 U.S. 533, 551–562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506, 527 (1964). We have no problem, therefore, in concluding that the right to vote is a right so fundamental that state restriction of it must be justified by some compelling state interest. Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600, 615 (1969); Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965, 971 (1963); Bates v. Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 4 L.Ed.2d 480, 486 (1960); Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194, 198 (1944).

The Alabama statute restricting this fundamental right to new arrivals in the counties and precincts is the kind of statute recently considered by the Supreme Court as one that "grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others" and, thus, must be shown "necessary to promote a compelling state interest". Kramer v. Union Free School District, 395 U.S. 621, 626–627, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583, 589 (1969). See also, Evans v. Corman, 398 U.S. 419, 421, 90 S.Ct. 1752, 1754, 26 L.Ed.2d 370, 374 (1970); Cipriano v. Houma, 395 U.S. 701, 704, 89 S.Ct. 1897, 23 L.Ed.2d 647, 650 (1969). Defendants have not proferred to us any compelling interest of the state that would necessitate the six and three month residency requirements to vote, nor do we perceive any on the basis of our judicial knowledge and experience. Instead, the defendants contend that no compelling interest need be shown, that only a showing of reasonableness is necessary, citing Drueding v. Devlin, 234 F.Supp. 721 (D. Md.1964) affd. per curiam 380 U.S. 125, 85 S.Ct. 807, 13 L.Ed.2d 792 (1965) which upheld as constitutional Maryland's one year residency requirement for presidential elections. That case is of doubtful viability. It has been rejected in two recent three-judge-court decisions holding a Massachusetts and a Tennes-

see residence requirement to vote unconstitutional. Burg v. Canniffe, 315 F. Supp. 380 (D.Mass.1970); Blumstein v. Ellington (M.D.Tenn.1970). These cases are consistent with the views of *Drueding* expressed by Justice Marshall in dissenting from the majority's dismissal of a voting case as moot because the challenged law had been amended:

> \* \* \* if it was not clear in 1965 it is clear now that once a State has determined that a decision is to be made by popular vote, it may exclude persons from the franchise only upon a showing of a compelling interest, and even then only when the exclusion is the least restrictive method of achieving the desired purpose.

Hall v. Beals, 396 U.S. 45, 52, 90 S.Ct. 200, 203, 24 L.Ed.2d 214, 220 (1969) (Marshall, J., dissenting).

Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817 (1904), upheld a Maryland statute requiring a one year residence to vote in state elections, saying:

> the privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper, *provided, of course, no discrimination is made between individuals in violation of the Federal Constitution.* (Emphasis added.)

193 U.S. at 632, 24 S.Ct. at 575, 48 L.Ed. at 822. Although discrimination may not have been shown in 1904, it has been shown to this court. We recognize also that modes of travel, not present in 1904, have played a key part to evince such discrimination by residency requirements. Moreover, *"Pope* was decided long before application of the 'compelling interest' test to restrictions on the franchise," Hall v. Beals, 396 U.S. 45, 53 n. 1, 90 S.Ct. 200, 204, 24 L.Ed.2d 214, 221 n. 1 (1969) (Marshall, J., dissenting).

Unquestionably, a state can limit its franchise to bona fide residents. Carrington v. Rash, *supra,* Lassiter v.

Northampton County Election Board, 360 U.S. 45, 51, 79 S.Ct. 985, 3 L.Ed.2d 1072, 1076–1077 (1959).[4] But with this legitimate end in mind, a state may not use means "which sweep unnecessarily broadly and thereby invade the area of protected freedoms", NAACP v. Alabama ex rel. Flowers, 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325, 338 (1964), absent a showing that such means are necessary to promote a compelling state interest. No compelling state interest has been shown in this case.

Amendment 207 and Tit. 17, § 12, discriminate against new arrivals who become bona fide residents of the counties and precincts of Alabama. Their requirements that a voter reside within the county for six months and the precinct for three months immediately preceding the election are violative of the equal protection clause of the Fourteenth Amendment to the United States Constitution.

### III. The issue of residence in Greene County

▆▆▆▆ For election law purposes "resident" means a domiciliary. Hogue v. Auburtin, 291 F.Supp. 1003 (S.D.Ala. 1968); Mitchell v. Kinney, 242 Ala. 196, 5 So.2d 788 (1942); Ex Parte Bullen, 236 Ala. 56, 181 So. 498 (1938); Wilkerson v. Lee, 236 Ala. 104, 181 So. 296 (1938). Concepts of domicile apply alike in the law of elections, of divorce, and of the administration of estates. Ex Parte Phillips, 275 Ala. 80, 152 So.2d 144 (1963) (*divorce*); Ex Parte Weissinger, 247 Ala. 113, 22 So.2d 510 (1945) (divorce); Ambrose v. Vandeford, 277 Ala. 66, 167 So.2d 149 (1964) (probate matter), (in all of which the court made a finding on the issue of domicile by first determining in which jurisdiction the party voted).

Drake claims that since November 3, 1969 he has been domiciled in the Dollarhide Community, a rural area of Greene County inhabited by 12 to 15 Negro families, where his mailing address is Route 1, Box D–7, Boligee.

▆▆▆▆ Acquiring a domicile entails the happening of two concurrent conditions: (1) the act of changing residence and (2) the intent to reside either permanently or for an indefinite time in the future at the new residence. Ex Parte, Bullen, *supra*. The act of changing residence and the intent to reside permanently or indefinitely at the new residence coalesce to form an important element that is present when a new domicile is acquired—there must be a present intention to abandon permanently or indefinitely the former domicile. Temporary absence from one's residence without the intent to abandon completely the former domicile will not create a new domicile. Wilkerson v. Lee, *supra*.

▆▆▆▆ A man has only one domicile. Ex Parte Weissinger, *supra*. The existent domicile continues until another is acquired. Ex Parte Phillips, *supra*; Ex Parte Bullen, *supra*; Talmadge's Adm'r v. Talmadge, 66 Ala. 199 (1880).

▆▆▆▆ We examine the facts in careful detail to see if Drake formed the intent to reside permanently or indefinitely in Greene County and to abandon his former domicile, and if he performed the necessary act of changing residence in effectuation of his intent.

Drake is 25 years old. He has lived nearly all of his life in Alabama and attended the public schools of Jefferson County. He entered the University of Alabama, at the Tuscaloosa campus, in

---

4. Although, as we hold in Part IV of this opinion, Drake is not a resident of the county and precinct where he attempted to register to vote, he has not lost standing to raise the constitutionality of the county and precinct residence requirements since he has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult * * * questions." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962).

1963. At that time his parents resided in Alabama, and undoubtedly his domicile was the domicile of his parents. Drake attended undergraduate school, and then law school, at Tuscaloosa until his graduation from law school in May, 1969. In 1967 his parents left the state, and Drake, then over 21, considered that he could establish a domicile in Alabama separate from that of his parents. The evidence establishes that he became a domiciliary of Tuscaloosa County.

In July, 1968 while living in a dormitory, he registered as a voter in Tuscaloosa County. Tit. 17, § 17, Code of Alabama, provides that one shall neither lose nor acquire residence by being a student of an institution of learning. In attempting to enforce this statute, Tuscaloosa County required that a student could register only after taking an oath that after graduation he intended to remain in Tuscaloosa. Drake took the oath, stating, "upon graduation from the University of Alabama I expect to make Tuscaloosa my home." He was registered—and remains registered there until this time.

In August, 1968 Drake moved from the dormitory to 1525–10th Street, Tuscaloosa, where he lived for a year. In November, 1968 he served as manager of the campaign of Rev. McKinley Branch, a Negro from Greene County, for Congress from the Fifth Congressional District (which includes Tuscaloosa and Greene counties) on the NDPA ticket, and in connection with the campaign spent some time in Greene County. At present Rev. Branch is a candidate for probate judge of Greene County on the NDPA ticket.

In April, 1969 in a case brought by him in the United States District Court for the Northern District of Alabama,[6] Drake testified "I live at 1525–10th Street, Tuscaloosa."

In May, 1969 Drake married, and he and his wife lived at the 10th Street

address. He maintained a telephone listing in his name, and paid other utilities although they were in the name of someone else.

On September 1, 1969 he entered into a formal, written lease of a house at 78 Brookhaven, Tuscaloosa, for the two year period September 1, 1969—August 31, 1971. In negotiating it, he was offered one rental rate on a month to month basis, a lower rate for a one year term, and a still lower rate ($135 per month) for a two year term. He chose the two year lease. The lease forbids underlease, transfer or assignment except with the written consent of the lessor.

The Drakes commenced occupancy of 78 Brookhaven. They have paid rent as due. The few items of furniture which they owned were put in the house, and other furnishings were loaned by friends. Drake secured a telephone and other utilities, all in his name. He and his wife have made the utility payments to date, and all remain in Drake's name. He is presently listed in the Tuscaloosa telephone directory at the Brookhaven address.

In May, 1969 in the United States District Court for the Northern District of Alabama, in a case concerning the registration of University students as voters in Tuscaloosa County, Drake testified that after graduation, which was to occur two or three days later, "I will be in Tuscaloosa. I am going to work here." In July he commenced the employment to which he referred, for an organization known as the Selma Inter-Religious Project, which furnishes legal and other counsel and assistance primarily to blacks, and to "civil rights organizations," in central and southwest Alabama, in Pickens, Greene, Wilcox, Lowndes, Hale, Dallas, Marengo, Sumter, Monroe, Crenshaw and Perry counties.[7]

Drake took the bar examination in July, 1969 and was admitted to the bar in September. Until his admission his services for the Selma Project were non-

---

6. Drake v. Rose, C.A. No. 68–653 (N.D. Ala.1969).

7. These counties fall in five different judicial circuits.

legal in nature. He traveled through the counties in which it operates and became acquainted with the persons involved in its work. In July he worked actively on behalf of Negro candidates in a special election held in Greene County. Some or all of the Negroes were elected.

After admission to the bar Drake became director of legal counsel of the Project, on a salary basis, and began furnishing legal advice and assistance around October 1. His assistant or staff counsel, Ralph Knowles, is also his law partner. The only office of the Selma Project is in Tuscaloosa, and Drake and his partner have in the past, and continue at this time, to list and employ it as their law office under the firm name of Drake and Knowles.

Drake testified that he last voted in Tuscaloosa County in mid-August, 1969.

On these facts we have no doubt that in mid-August, 1969 Drake was domiciled in Tuscaloosa. He had acquired that status in a normal manner by routine actions, and had put icing on the cake with nonroutine actions. Tuscaloosa was the situs of his only house, shared with his recent bride, the location of the only office of his sole employer, the situs of such personal property as he owned, and the place where he voted. He had stated in many ways his intent that Tuscaloosa be his home. He had manifested his intent with numerous acts consistent with it. In addition he had expressed his intent under oath, in court and out. And, to become entitled over official opposition to vote, he had given required proof of domicile.

Drake says that he made the decision to move to, or "establish residence", in Greene County between August and October of 1969. He states that in late September or early October he had decided he wanted to run for circuit judge of the Seventeenth Circuit, was aware of the residential requirements, and was convinced that he would be denied the right to run on the ground of

lack of residence. He talked with a law professor for the purpose of discussing how he could "establish residence" in Greene County so that he could not be prevented from running. Drake describes the professor's advice as:

[H]e told me that I should rent a house in Greene County, and that's all. And I explained to him about the house in Brookhaven, and he said that didn't matter because my wife was in school here. Then I went ahead and, in my judgment, did more than he advised me to.

From that time forward, down through pleadings and briefs in this case, Drake has focused upon the establishment of what he terms "indicia of residence" which would tend to prove Greene County domicile. But elements of proof must not be confused with the underlying substantive requirements of intent to reside in a new place, intent to abandon the existent domicile, and acts done to take up residence in a new place.

In either October or early November, 1969 Mrs. Lewis Walton, a Negro resident of the Dollarhide community, was approached by Rev. Thomas Gilmore, a Negro active in civil rights and political affairs in Greene County (and at present candidate for sheriff on the NDPA ticket). He introduced Drake to Mrs. Walton and told her that Drake was "looking for a place to live" and inquired about a house the Walton family had recently vacated.[8] The next day Drake and Rev. Gilmore talked to Mr. Walton. Drake stated that he was "getting ready to run for Judge," and that he "needed a house and residence." On November 3, Drake signed a lease with the Waltons for one year at $75 per month.

Other than the conversation with the law professor and the initial dealings about the house, the date of which is uncertain, Drake took no overt action of any kind toward "establishing residence"

8. Some of the testimony places this initial inquiry as early as the first week in October, other as late as November 1.

in Greene County until November 3, 1969.[9]

On November 3 and the following day there was a flurry of events. Beginning in April Drake had made eleven speeches to groups in Greene and Sumter Counties mentioning the probability of his becoming a candidate for circuit judge, and he had privately discussed his intentions to run with persons in all three counties. November 3 appeared to be the final day on which to get in under the wire.[10] By statute the general election in Alabama is always on the first Tuesday after the first Monday in November, Tit. 17, § 68, Code of Alabama, which in 1970 is November 3.[11]

On November 3, Drake signed the lease. He wrote the Selective Service Board in Birmingham, a Tuscaloosa bank with which he had an outstanding loan, and the circuit court clerks in Tuscaloosa and Greene Counties giving as his new address Route 1, Box D–7, Boligee. On November 4 he opened a bank account in Eutaw, the county seat, giving the Boligee address, and subscribed to the Greene County weekly newspaper, to be sent to Boligee.

The letter to the circuit clerks is inconsistent with other acts by Drake. He testified that all his business correspondence goes to his office in Tuscaloosa. Though his legal work carries him into the courts of several counties, he wrote only to Tuscaloosa and Greene. On all pleadings filed by him in all courts since November 3, 1969 Drake has shown as his business address the Tuscaloosa office.[12]

The house at 78 Brookhaven, Tuscaloosa, is brick veneer and siding, appearing to be of the general quality seen in medium and lower medium income subdivisions in cities and towns of the South. The family's few items of furniture have remained there. The house at Dollarhide is a simple wood frame house with electricity and a bathroom. The water supply is from a well. The house was rented furnished (one room has no furniture). The Drakes have brought to it only a few pots and pans, and the only clothing there is out of season garments brought for storage. On some occasions Drake has eaten lunch at the house; on other occasions he has had lunch with the Waltons. Drake has regularly paid the rent. He has had electric service put in his name, and has purchased butane gas in his name. He inquired about telephone service but found the cost of installing a line would be prohibitive.

Drake has never spent a night in the house, although it is only 45 minutes driving time from the Tuscaloosa house. Except when required to be elsewhere on business, he always has returned at night to 78 Brookhaven. Mrs. Drake has been to the house only two or three times. Although her husband's work requires him to be away from Tuscaloosa approximately one third of the weekends, she has used the house only one weekend and then for a meeting with a group of women.

The mail box given by Drake as his address is the Waltons' box, though used by several families. Most of the mail to the Drakes has consisted of the weekly

---

9. His affidavit furnished to the Board of Registrars in July, 1970 when he applied to register to vote, states that he had resided at the Boligee address since October 30, 1969. That date is before he leased the house.

10. We do not consider the very technical question of whether it was one day too late, which involves construction of the phrase "preceding his election," and the counting of time. See, Tit. 1, § 12, Code

of Alabama; Grice v. Taylor, 273 Ala. 591, 143 So.2d 447 (1962); Boyett v. Frankfort Chair Co., 152 Ala. 317, 44 So. 546 (1907).

11. Drake's testimony was that he thought the 1970 election would be November 9. That date is a Monday.

12. One document, an amicus brief filed in a court in a distant state, has carried the Boligee address.

newspaper, electric bills and statements from the Eutaw bank.[13] The rural mail carrier has never seen either Mr. or Mrs. Drake at the Boligee house.

With few exceptions the Drakes have continued to purchase their groceries in Tuscaloosa and have had their laundry and cleaning done there. Such charge accounts as they have are with Tuscaloosa stores. Their joint checking account in a Tuscaloosa bank is the family's primary bank account, and approximately 70 per cent of the family income has been deposited in it. That bank was not notified of a change of address, nor was another Tuscaloosa bank which held their car note in November, 1969.

On November 14, 1969 Drake purchased a 1970 automobile license in Greene County for his wife's car. In March, 1970 he purchased for himself a new Toyota automobile from a dealer in Tuscaloosa. (There is no Toyota dealer in Greene County.) On the conditional sales contract his address is shown as 78 Brookhaven, Tuscaloosa. The note and conditional sales contract show on their faces that they were assigned to the same Tuscaloosa bank which Drake had written on November 3, 1969 giving Boligee as his new address. That bank sent payment notices to 78 Brookhaven, with no objection from Drake. Tuscaloosa plates were put on the car at the time of purchase.

The Brookhaven address was written in on a number of checks given by the Drakes in 1970 on both the Tuscaloosa and Eutaw bank accounts.

Since November 3rd Drake and his partner have continued to use the office of the Selma Project in Tuscaloosa as their law office. Drake has no Greene County office and no secretarial help there except that furnished by others. The Eutaw telephone numbers on his

professional card are the numbers of public offices, the Greene County Housing Authority, for which he became attorney in February, 1970, and the County Commission (the county governing body), for which he states he is an unpaid "informal adviser," and whose meetings he regularly attends. He has rendered legal services to the Greene County Board of Education and the Recreation Board of Greene County.

In 1969 Drake's only income was from the Selma Project. In 1970 approximately 90 per cent has come from the Selma Project and his retainer from the Housing Authority. Approximately ten per cent has come from private clients scattered generally throughout central and southwest Alabama. Drake estimates that 60 per cent of his employment time has been spent in Greene County since November, 1969 and 25 per cent in Tuscaloosa County.

Drake does some writing in Greene County, part of it while working out of the Housing Authority office, some at the Boligee house, where he states that he may be writing letters, working on written work, or visiting the Walton family, who live close by.

Drake describes the continued maintenance of the house at Tuscaloosa as a matter of "convenience and choice" for himself and his wife, consisting of two factors. Mrs. Drake is a full time graduate student and some of her courses require her presence in Tuscaloosa. The second is her pregnancy and Drake's lack of confidence in Greene County doctors.[14] Mrs. Drake's doctor is from Tuscaloosa. Her pregnancy has not been accompanied by any unusual problems. In any event, the pregnancy has no application to much of the period from November 3, 1969— the child is expected to be born in February, 1971.

13. The charge was made in this case that the Eutaw bank, of which the incumbent circuit judge is a director, was withholding from Drake his latest cancelled checks and bank statement. It developed that they had been mailed in due course on August 31, 1970 to the Boligee address, and that between August 31 and September 16 Drake had been to the house only one time and had not picked them up.

14. Drake raised several objections to Greene County doctors. One was "I don't like small town doctors."

Drake points to his effort to register as a voter in Greene County in July, 1970. Voter registration occurs throughout the year. No explanation is offered for the delay of 8½ months in seeking to become an elector in the county of alleged new residence.[15] Drake has not notified Tuscaloosa voting registrars of any termination of his residence there or taken any other action to have his name removed from the poll list of that county. His explanation is that it was not his legal duty to do so.

Drake relies heavily on his motives for attempting to "establish residence" in Greene County. The desire to run for circuit judge is a "big part" of his motivation. Also he expresses a desire to practice law in Greene County, to aid blacks who are said to lack legal representation in a geographical area where there has been repeated litigation to vindicate their rights. He states a wish to become part of the community in order that blacks will lose suspicion of him as a white person.

But Drake's motive is immaterial, Young v. Pollak, 85 Ala. 439, 5 So. 279 (1888), except to the extent that it may be circumstantial evidence of his intent. People change their domiciles for motives worthy and unworthy. Good motives do not create domicile any more than bad motives prevent it. Nor can we accept the bootstrap concept that since Drake knew he had to meet the residence requirement he must have formulated whatever intent was essential for compliance with the legal standard.

We conclude that Drake has not acquired a domicile in Greene County, because he neither possessed the intent nor did the acts required by law. His desire to run for circuit judge and his intent to secure for himself the benefit of the legal consequences of a Greene County domicile do not dim what appears with manifest clarity, that his intent has been not to abandon his Tuscaloosa County domicile but to maintain it. And, viewing all his acts in perspective, those which tend to show change of residence to Greene County are overshadowed by those tending to show continuation of the Tuscaloosa residence. Drake could not have two domiciles. His domicile remained in Tuscaloosa.

IV. The constitutionality of residence requirements for candidates.

The Alabama constitution, Art. 6, § 142, provides:

> Except as otherwise authorized in this article, the state shall be divided into convenient circuits. For each circuit there shall be chosen a judge, who shall for one year next preceding his election and during his continuance in office, reside in the circuit for which he is elected.

The Alabama Code, Tit. 13, § 176 provides:

> *Residence of judge.*—Each circuit judge must have resided in the circuit for which he is elected or appointed for at least twelve months preceding his election or appointment, and must reside in such circuit during his continuance in office.

We conclude that the State of Alabama has a compelling state interest in imposing a substantial pre-election residence requirement for circuit judges. Since Drake has at no time become a resident of the judicial circuit, we need not decide whether the period of one year is too long, thus unconstitutionally overreaching the implementation of the state's compelling interest.

Compelling state interest necessarily is extremely difficult to establish by objective proof. We are aided in this case by the fact that the office is a judicial one, and our own knowledge of the operation and demands of the judicial system and the functions of judges gives us considerable guidance.

The State of Alabama has a compelling state interest in exposing to the voters

15. The statewide Democratic primary, in which the NDA was both interested and vocal, took place in May, 1970.

for a substantial period of time before election the person who will be a candidate for state circuit judge. The circuit court is the basic court of the state judicial system, the keystone of the structure. There are 37 circuits. In many counties, particularly rural areas, the circuit court is the only court other than justices of the peace with very limited jurisdiction and the probate court.

The circuit court is charged by law with many judicial functions. It has jurisdiction of civil claims exceeding $50. It is the equity court. It has criminal jurisdiction of both felonies and misdemeanors. It exercises appellate jurisdiction (usually by trial *de novo*) of civil and criminal cases cognizable before various inferior courts of limited jurisdiction, such as justice of the peace courts. In addition, it has general superintendence over inferior courts. Tit. 13, § 126, Code of Alabama.

The equity power of the court is very broad. Tit. 13, § 129–144. Under its equity powers the court has jurisdiction over domestic relations, divorce and child custody. Basic jurisdiction over juveniles is in the probate court, Tit. 13, § 351, but in many of the urban areas it has been transferred to circuit judges by local legislative acts.

The court of original jurisdiction for decedents' estates and guardianships is the county probate court, whose functions are part judicial and part administrative. But its jurisdiction is strictly limited by statute, it does not have general equity powers, and in many counties the probate judge is not a lawyer. Because of these limitations, the administration of estates—decedents' and guardians'—even uncomplicated ones, is often removed to the circuit court. Tit. 13, §§ 138–139; Tit. 21, § 26. In addition, settlements of decedents' estates and guardians' estates in the probate court are reviewable in the circuit court. Tit. 13, §§ 145, 147.

The grand jury in Alabama, in addition to the usual duties of considering possible offenses, has very broad investigatory powers over county affairs and public matters. Tit. 30, §§ 76–82; State v. Knighton, 21 Ala.App. 330, 108 So. 85 (1926). The circuit judge draws the grand jury, Tit. 30, § 30, empanels it, charges it, Tit. 30, § 75, and may recess it subject to his recall, Tit. 30, § 72.

We consider it to be of urgent importance that the voter have an opportunity to observe, learn about and appraise those who seek to be candidates for a key judicial office that touches important events and relationships of their lives and of the community in which they live. There are innumerable qualities and qualifications that are relevant.

There is the matter of qualification in the more technical sense. Is the candidate learned in the law, experienced or novice, up to date on current legal developments or indifferent to them? Is he old enough to possess maturity, and, on the other hand, is he too old to be effectual?

The voters are entitled to know about less technical questions of temperament. Is the candidate's judgment balanced or lacking in stability? Does he possess qualities of fairness and of freedom from prejudice—racial, religious, political, or otherwise? Is he sensitive or callous to mankind's needs?

Those who may be jurors, parties, witnesses, and even lawyers, want to know what to expect in the courtroom and the judge's chambers, whether they can anticipate courtesy, respect and understanding to all, or selective treatment, or even judicial tyranny.

The circuit judge's role in the family relationships of those in his jurisdiction, by his powers over marital differences, divorce and child custody, is a peculiarly sensitive one. The voter is entitled to know about the candidate's own family relationships, whether he has a stable family of his own, understands the problems and difficulties of marriage and of children, and whether he has the desire, capacity and patience required for the efforts at reconciliation and compromise that are part and parcel of the effectual domestic relations judge.

Those who are selecting a judge for criminal cases are entitled to know the candidate's views on punishment—is he a "hanging judge," a compassionate person, or one wholly unable to grasp the nettle of inflicting criminal punishment? Does he believe in probation? Will there be racially or economically motivated disparities in sentences? The voter will want to know whether in his own life the candidate has exemplified obedience and respect to the law or has flouted it, and whether he has been dominated by or associated with criminals.

The state of the candidate's economic and business affairs is relevant. Will his ownership, or lack of ownership, of property affect his decisions? Does he engage in business affairs, and if so to what extent, and do they so tie him to particular persons or groups that there is a risk of favoritism?

Finally we note the overriding question, whether the candidate's overall qualifications will engender confidence in himself, in the judicial system, and in the quality of justice he will dispense.

The catalog could be endless. The democratic process contemplates that the voters shall make a choice. In the case of this important judicial office the state has a compelling interest in attempting to see that the voters have the opportunity that their choice be an informed one. Assertion of the state interest will bring imperfect results. Less than all voters will observe, learn and rationally choose, but this is not to deny to the state its interest in extending the opportunity.

Discriminating care is employed in other ways of selecting judicial officers. The Missouri plan, and like methods of selecting judges, embrace screening by persons with particularized knowledge of capabilities, qualifications and performance, followed by voter consideration.

The appointive process for federal judges, with careful investigations by the executive department, by the American Bar Association, and confirmation by the Senate, points in the same direction, which is that whatever the selection procedure and whoever makes the selection, there is every reason for full knowledge, and no merit whatsoever in selecting in the dark.

The particular significance of exposure by residence is demonstrated in this case. The three counties are rural and sparsely populated. There is no television station in the circuit, one radio station, no daily newspaper. Necessarily communication between candidate and voter is personal and personalized. Information which under other circumstances might be communicated by more formal means necessarily is communicated informally by personal acquaintance and observation, by word of mouth from neighbor to neighbor. The voters acquire general community knowledge about the candidate, while at the same time the candidate builds a community reputation concerning many of the traits to which we above referred. These are processes which cannot operate overnight. But they represent appropriate functioning of democracy.[16]

The fundamental difference between the majority on the issue of candidate residence requirements and the dissent of Judge Johnson on that single issue is that the majority recognize that the role of the candidate and of the voter differ in a democratic society, so that the state may have a compelling interest in requiring residence for candidates that is different from its asserted interest in requiring residence for voters. Participation in the political process and freedom to move from place to place are overriding considerations in the case of the voter. His qualifications are mini-

---

16. Durational residence requirements for those who are to perform important functions in the judicial system are not confined to judges, nor the imposition of them to the states. Under the uniform plan adopted by this and all other United States District Courts in the Fifth Circuit, pursuant to the Jury Selection and Service Act of 1968 (28 U.S.C. § 1861 et seq.), for a person to be qualified for jury service he must have resided within the judicial district for one year.

mal, and he need subject himself to the scrutiny of no one in the performance of his role in selection of public officers. Except in extraordinary cases the percentage of non-durational voters predictably is small. Democracy is flexible enough to stand the strain. The candidate is one of a much narrower group, in this case one of two persons. He must have the special capacities that will enable him to perform the office he seeks,[17] and his possession or lack of possession of those capacities need to be exposed to those who will make the choice. Nonexposure of the narrower group—the candidates—with voters choosing from lack of knowledge, is a much more serious strain on the sinews of democracy.

The dissenting opinion characterizes the effect of our decision as a denial to the black voters of the opportunity to choose freely the candidate of their choice. This applies a racial label where none is appropriate. The issue is the constitutionality of residence requirements for all candidates of all parties for circuit judge. Whether a particular candidate is the nominee of one party or another, or the favorite of one race or another, is unrelated to alleged facial unconstitutionality of the residence requirements. As the dissent recognizes, "he [the voter] is entitled to vote for any candidate of his choice, subject to valid conditions and qualifications imposed by the state." Each voter of the Seventeenth Judicial Circuit has the right to vote for his choice so long as, and only so long as, the choice is of a qualified candidate.[18]

The NDPA, like all other parties, has the right to have its candidates on the ballot—and this court will do its best to protect that right—if the candidates meet valid qualifications. The NDPA is not being kept off the ballot by a pervasive statutory scheme as was involved in Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). It has numerous candidates, statewide and local, in the November 3 election, from governor on down. In Greene County alone the probate judge already has sent to the printer a tentative list of candidates to appear on the ballot, which includes NDPA candidates for judge of probate, sheriff, clerk of circuit court, coroner, and two places on the board of education.

The dissent places its greatest emphasis on § 144 of the Alabama Constitution under which a circuit judge may sit in another circuit. The Chief Justice of the Alabama Supreme Court makes such assignments from time to time. This comprises the structure for filling the need in instances of illness, death and disqualification of judges and overloaded dockets. It is an administrative tool, often employed for a single case.[19] Such an assignment sends temporarily to another circuit a person who has been screened by the voters of his own circuit and found qualified to be a circuit judge. This has no more than the remotest tangential relation to what qualifications are appropriate for one to be selected in the first instance as a circuit judge by the voters for whom substantially all of his service will be rendered.

17. The dissent refers to two of those specifically required by law: good moral character and knowledge of the law.

18. We note also the allegation that Drake has worked with the black people of the Seventeenth Circuit and understands them better than the attorneys who reside there, which is cited as probative of the absence of necessity for residential requirements. But without such pre-election residence requirements, in the next set of circumstances a person wholly unknown to the voters, who has done none of the work which Drake says he has done, and may

be wholly lacking in the understanding which he says that he possesses, could qualify as a candidate. That Drake says he has voluntarily done certain things within the circuit without becoming a resident is not to say that the state may not validly require that all candidates for judgeships expose themselves to the voters of the circuit by residing therein.

19. Its function and operation are familiar to Judge Pittman of this panel, who served for fifteen years as a state circuit judge.

While the number of states that have residence requirements for trial judges similar to those of Alabama does not establish the validity of such requirements, we observe that they are not so scarce as the dissent implies. Am.Jur.2d Desk Book (1962 ed.) p. 193 shows 28 states having requirements that state trial court judges reside before election in the geographical area of the court.

Either directly or indirectly Alabama has, in the past, maintained pre-election residence requirements for all state officers. Tit. 41, § 5, Code of Alabama, requires that a person is ineligible to hold public state office unless he is a qualified elector.[20] The durational residence requirements for voters have operated as residence requirements for candidates in instances where no other specific residence period is prescribed for the candidate. Thus a sheriff, county commissioner or county treasurer—officers referred to by the dissenting opinion—could not be elected unless a resident of the county for six months.

In addition, specific pre-election residence requirements are provided for many Alabama state offices: Governor and Lieutenant Governor, ten years in the United States, seven years in the state (Alabama Constitution, Art. 5, § 117); Attorney General, Auditor, Secretary of State, Treasurer, Superintendent of Education, Commissioner of Agriculture and Industries, seven years in the United States, five years in the state (Alabama Constitution, Art. 5, § 132); members of the legislature, three years in the state, one year in the county (Alabama Constitution, Art. 4, § 47); and probate judges, one year in the county (Alabama Code, Tit. 13, § 273).

Moreover, pre-election residence requirements are not unknown for federal elective officers. The President of the United States must have been "a resident within the United States" for fourteen years. Art. 2, Sec. 1, Constitution.

**V. The poll list and list of absentee voters.**

There is no merit to the claim that if Drake cannot be a candidate for lack of residence the poll lists and absentee voter lists of all counties in the circuit must be examined and purged to see if any person is registered as a voter who has "less indicia of residence" than Drake. Residence requirements to be a candidate need not be the same as to be a voter.

**VI. Compliance with the Corrupt Practices Act.**

Judge Hildreth contends Drake has failed to comply with the filing requirements of the Corrupt Practices Act, Tit. 17 §§ 274 and 275 [21] and, thus, his name should not be allowed to appear on the ballot at the November 3, 1970 general election. The sections read in material part:

*Section 274.* Any candidate shall, within five days after the announcement of his candidacy for any office, * * * if it be a district or circuit office, file with the judge of probate of each county which is embraced in said district or circuit, the name of not less than one person * * * elected to receive, expend, audit and disburse all moneys contributed * * * for the purpose of aiding or promoting * * * the election of such candidate.

*Section 275.* Any person who shall act as his own committee shall be governed by the provisions of this article relating to committees designated by candidates. Failure to make the declaration of appointment or selection * * * is declared to be a corrupt practice, and * * * the name of

---

20. The constitutionality of this section has been raised in this case but the court has not reached that question.

21. In 1968, in earlier proceedings in Hadnott v. Amos, 295 F.Supp. 1003 (M.D. Ala.1968), rev'd on other grounds, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969), this court held these sections were not facially unconstitutional.

such candidate so failing shall not be allowed to go upon the ballot at such election.[22]

Drake was nominated at a mass meeting of the NDPA around August 1, 1970. On September 1, 1970 pursuant to Tit. 17, § 145, the NDPA officially certified Drake as its candidate with the probate offices of the counties in the Seventeenth Judicial Circuit. On September 5, 1970 Drake filed his Corrupt Practices Act compliance papers with the appropriate probate offices.

Judge Hildreth contends, however, that the mass meeting nomination, and other political maneuvers of the NDPA constituted an announcement of candidacy by Drake more than five days prior to September 5, 1970.

We hold that announcement of candidacy occurs at the time of the filing of the certificate of nomination pursuant to Tit. 17, § 145. See Herndon v. Lee, 281 Ala. 61, 199 So.2d 74 (1967).

To hold that "announcement of candidacy" refers to the actions of individual candidates and parties, often indistinct in time and context and subject to interpretations which vary depending on the eye of the viewer, would promote confusion and uncertainty in the operation of a statute which needs to function with orderliness and precision. Moreover, such uncertainties promote equivocation among those who are candidates but must pretend they are not. We hold that Drake was in compliance with the Corrupt Practices Act.

## VII

This case has been submitted on the petitions for temporary restraining order and temporary and permanent injunctions and for final decree, on the pleadings and extensive proof consisting of depositions and numerous exhibits, and on oral argument of counsel. This opinion constitutes the findings of fact and conclusions of law of the court.

It is, therefore Considered, Ordered and Decreed as follows:

1. The provisions of Amendment 207 to the Constitution of Alabama, and of Tit. 17, § 12, Code of Alabama, limiting the franchise to persons who have resided in the county six months and in the precinct or ward three months violate the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. Lucille Morrow, Bland Walker and C. M. A. Rogers, members of the Board of Registrars of Greene County, are restrained and enjoined from applying or enforcing said provisions.

2. J. Dennis Herndon, R. J. Westbrook and W. G. Dearman, as Judges of Probate of Greene, Marengo and Sumter Counties, respectively, are restrained and enjoined from placing or causing to be placed on the ballot in their respective counties in the general election of November 3, 1970 the name of Jack Drake as a nominee for circuit judge of the Seventeenth Judicial Circuit.

3. Jack Drake is not in violation of the Alabama Corrupt Practices Act on the basis of untimely filing with the probate judges of Greene, Marengo and Sumter counties of his designation of a finance committee.

4. The State of Alabama has a compelling state interest in imposing a substantial pre-election residence requirement on candidates for state circuit judge.

5. All other relief sought is denied.

PITTMAN, Judge (concurring specially as to part II).

I agree with the majority holding that the Alabama six months residency requirement is unconstitutional, but I do not wish to indicate that I think all durational or calendar residency requirements are unconstitutional. Blumstein v. Ellington (M.D.Tenn.1970), p. 11 of the majority opinion, is cited with ap-

---

22. The doing of an act declared to be a corrupt practice is criminally punishable as a misdemeanor. Tit. 17, § 332.

proval. The court in that case declared unconstitutional a three months county residency requirement. Although I agree with the general tenor of the case, and its treatment of the necessary compelling state interest, I disagree with its ultimate holding striking down a three months county residency requirement.

I recognize the principle that the state must have a compelling interest to place any restriction on the right to vote. On page 113 of the majority opinion, it is stated "Defendants have not proferred to us any compelling interest of the state that would necessitate the six and three month residency requirements to vote, nor do we perceive any on the basis of our judicial knowledge and experience." I disagree. I think Alabama has a compelling interest which justifies placing a durational or calendar residency requirement on the right to register and vote. In determining a compelling state interest, the court should not ignore those things of which it has judicial knowledge nor which are of common knowledge. The legislatures of most states have required voters, as well as candidates, to be residents for varying lengths of time prior to registration for voting.[1] Durational residency requirements enable the voter to better understand and inform himself on state and local issues, geography, political, social and economic problems.

A durational residency period will give the voter an opportunity to know and evaluate the candidates who seek to have the leadership role as an elected official among them. It is true that political hucksters and image makers using the mass news media can make a face and name familiar, but we are all too well aware of the difference between image and reality.

The Alabama Legislature removed durational or calendar residency requirements in divorce actions when both parties are before the court.[1A] The "quickie divorce" scandal which followed is well known. In connection with "quickie divorces," lawyers have been suspended or disbarred and the divorce jurisdiction of a judge removed. In recent weeks indictments have been returned against other lawyers and judges in connection with charges arising out of the so called "quickie divorces."

The "quickie divorce" scandal in Alabama illustrates how easily residency can be abused and fraud and corruption reach alarming proportions where there is no durational or calendar period of time in which a person's intention to be a resident can be demonstrated by acts as well as words. The right to vote should be unencumbered, but common sense regulations are mandatory if the integrity of the ballot box and registration rolls are to be maintained. I cannot ignore the experience and knowledge acquired by my approximate fifteen years as a State Circuit Judge when I handled 150–200 divorce cases a year wherein there was demonstrated the inherent advantages of durational or calendar residency requirements and the difficulties attendant to determining residency without such requirements.[2]

There are other recognized qualifications on the right to vote such as citizenship, age, sanity, no prior conviction of felony or crime involving moral turpitude unless civil rights have been restored.[3] It is a fact of life that some regulations provide greater freedom whereas no regulations would result in license.

With no durational or calendar residency requirements other than the last registration period, if not within ten days prior to an election,[4] what is to pre-

---

1. Am.Jur.Desk Book, Doc. No. 117 (1962).

1A. Ala.Code, Tit. 34, §§ 27, 29, Recomp. (1958).

2. Id.

3. See Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 51, 79 S.Ct.

985, 3 L.Ed.2d 1072, 1077 (1959). 29 C.J.S. Elections §§ 15–35.

4. Persons in Alabama may register to vote if not within ten days of an election. Ala.Code, Tit. 17 § 27(2), Recomp. (1958)

vent self-seeking interest groups from roaming the state, county by county and precinct by precinct, registering in large numbers and virtually taking over or controlling local governments?

It was stated in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), a welfare case in which a one year residency requirement was struck down, pp. 636, 637, 89 S.Ct. p. 1332, that the arguments of a waiting period as an efficient rule of thumb would not withstand scrutiny in that case because "before granting an application, the welfare authorities investigate the application, employment, housing, and family situation and in the course of the inquiry necessarily learn the facts upon which to determine whether the applicant is a resident." There is no such investigative machinery in Alabama in connection with the registration to vote. It is common knowledge that here registration is based principally on answers by the registrant, and close to an election it is a hectic and frantic experience for registrant and registrars.

It could well be that the emerging role of Negro voters and candidates, particularly in those counties where they have a majority, could be overwhelmed by outside groups registering in their respective counties in such numbers as to place them in the minority.

I would hold Alabama's six months county residency provisions unconstitutional because it is infected with racial discrimination. Alabama's first and second Constitutions of 1819 and 1861, Article 3, Section 5, respectively, had du-

rational residency requirements of one year for the state and three months for the county. The vast majority of Negroes were slaves and there could not have been a racial purpose in these provisions. The Constitution of 1868, Article 7, Section 2, had a state requirement of six months and a county requirement of three months.[5] The 1901 Constitution, Amendment XCVI, raised the residency requirements in the state to two years and county to one year. Amendment 207 to the Alabama Constitution of 1901 reduced the residency requirements in the state to one year and in the county to six months.[6]

Without question, the increase of the residency requirements subsequently to the emancipation of the Negro slaves falls within a suspect classification.[7]

The vote is the single most powerful instrument of a citizen in our country. In most instances, elective office depends on a majority vote. Enormous sums of money are spent to win elections. If history is worthwhile as a teacher, one of its lessons has been that fraud and corruption are not unknown in elections.

Our society is the most mobile in world history. Means of communication have vastly improved the quickness one can obtain knowledge, yet this very mobility and this very ease of communication has built-in dangers. The way is opened for persons intent upon fraud, or those with special interests, to impose their will upon local areas by outside persons flooding the registration process just before an election. The image makers can complete the job. To safeguard the sanctity

5. McMillan, Constitutional Development in Alabama, 1798–1901, A Study in Politics, the Negro and Sectionalism (1955), at p. 138 stated the 1868 Constitution was one in which the Reconstructionists "[r]educed the residency requirement * * * [so that] Carpetbaggers and Negroes might become candidates for the * * * legislature. * * *" That three months county residency provision could hardly be termed racially discriminatory against the Negroes.

6. McMillan, supra, p. 363, "restrictions were written into the Constitution of 1875

until it became an 'instrument of prohibition'." " * * * legal expedients were used to control the Negro vote from 1875 to 1901." And, p. 276, "the long residency requirement, for instance, would effect adversely the Negro * * *."

7. "It should be noted * * * that all legal restrictions which curtail the civil rights of a single racial group are immediately suspect." Korematsu v. United States, 323 U.S. 214, at 216, 65 S.Ct. 193, at 194, 89 L.Ed. 194, at 199; Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1124–27 (1969)

of the ballot box, the integrity of its registration rolls, and to assure that local government will be by and of bona fide local residents, constitute a compelling state interest to set durational residency requirements. A "quickie voter" registration can, and probably would, develop and flourish as fast as the "quickie divorce" racket came into being in Alabama.

JOHNSON, District Judge (dissenting in part):

With deference to the other members of this Court, I strongly disagree with that part of the opinion that puts a judicial stamp of approval on the constitutional [1] and statutory [2] provisions of Alabama dealing with residency requirements for candidates for the office of circuit judge. It was pursuant to those provisions of Alabama law that Judge Hildreth, present incumbent and now a candidate for reelection as circuit judge for the Seventeenth Judicial Circuit of Alabama, filed a complaint alleging that Jack Drake was not qualified as a candidate for circuit judge of the Seventeenth Judicial Circuit in that he had failed to meet the 12-month pre-election residency requirement.

The effect of this action on the part of Judge Hildreth is to seek to remove from the ballot a man who is the candidate of the predominantly black National Democratic Party of Alabama. To deny Drake the opportunity to run for the office of circuit judge will, in effect, be to deny the black voters of the predominantly Negro Seventeenth Judicial Circuit the opportunity to freely choose the candidate of their choice.

It is now a part of our basic law in this country that qualified citizens have a constitutionally protected right to vote and to have their votes counted. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915). The right to exercise the franchise in a free and unimpaired manner is "a fundamental right, * * * preservative of all rights." Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886); Reynolds v. Sims, supra. In holding that the right to a meaningful vote is fundamental to our democratic way of life, the Supreme Court has recently, in an uninterrupted line of cases, applied the "necessary to promote a compelling state interest" test to voter cases. See Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (June 15, 1970); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). Furthermore, the Supreme Court has emphasized that "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." Reynolds v. Sims, supra.

There can be no question that if a citizen is entitled to vote and have his vote counted, he is entitled to vote for any candidate of his choice, subject to valid conditions and qualifications imposed by the state. In Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), a case involving the right of a political party (George Wallace's Independent Party) to have the names of its candidates listed on the ballot in Ohio, the Supreme Court stated that qualified voters, regardless of their political persuasion, have a constitutional right to cast their votes effectively. The Supreme Court in the *Rhodes* case stated:

"The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. * * * In determining whether the State has power to place such unequal burdens on minority groups where rights of this kind are at stake, the decisions of this Court have consistently held that 'only a compelling state interest in the

1. Ala.Const. Art. VI, § 142.

2. Ala.Code, T. 13, § 176.

regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms.' NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)."

The right of the candidate to seek public office is, therefore, so inextricably intertwined with the right of the voter to vote effectively that an infringement on one right will necessarily have a deleterious effect on the other. Cf. Smith v. Paris, 257 F.Supp. 901 (M.D.Ala.1966) (3-judge court); Sellers v. Trussell, 253 F.Supp. 915 (M.D.Ala.1966) (3-judge court).

Thus, under the "necessary to promote a compelling state interest" test enunciated in *Kramer* and *Rhodes,* supra, the only way Alabama can constitutionally justify the one-year durational residency requirement for candidates for the office of circuit judge is to show a "compelling state interest," and when such a justification is offered, the court must "meticulously scrutinize" the evidence.

In concluding that the State of Alabama has a "compelling state interest" in imposing a substantial pre-election residency requirement for a candidate for circuit judge, the other two members of this Court, after virtually acknowledging by their statement that such an interest is "extremely difficult to establish by objective proof," apparently base their conclusion on their "own knowledge of the operation and demands of the judicial system." The other members of this Court base their "compelling state interest" conclusion upon the argument that candidates for the office of circuit judge should be exposed to the voters for a substantial period of time before election in order to allow the voters an opportunity to observe and appraise those who seek the office. They discuss temperament and judgment and judicial qualities. They also apparently consider it important that one serving as a circuit judge get to know the people and the litigants that make up the circuit. To me, these are superficial arguments and they do not come close to establishing a "compelling state interest" for this durational residency requirement for candidates for circuit judge.

There are some elective offices in the State of Alabama for which no pre-election residency in the district or circuit is required. The office of sheriff, for example, is a highly sensitive position and one which all must acknowledge requires a close rapport with the residents of the community. Yet sheriffs are not required by Alabama law to reside in the county prior to their election. The same holds true for county commissioners and county treasurers. Good moral character and knowledge of the law are required of candidates for circuit judgeships by other provisions in the Alabama law. Ala.Const. Art. VI, § 154; Alabama State Bar ex rel. Steiner v. Moore, 282 Ala. 562, 213 So.2d 404 (1968); Opinion of the Justices, 279 Ala. 38, 181 So.2d 105 (1965). That part of the justification for giving constitutional approval to Alabama's durational residency requirement for circuit judges advanced by the other members of this Court, to the effect that a candidate should be exposed to the voters for a substantial period of time before the election, in my opinion completely falls in view of that part of the opinion of this Court set forth in Section II that holds, and I think correctly, that voters need not reside in the county in which the candidate for judge is running for office for any length of time prior to the election. How incongruous to hold that the candidate must be "exposed" for a year so the voters will know him when the voters are not constitutionally required to reside in the geographic area in which the candidate is being "exposed"!

In my judgment the strongest argument that Alabama has no "compelling state interest" in this durational residency requirement lies in Section 144 of Article VI of the Constitution of Alabama, which provides:

"A circuit court, or a court having the jurisdiction of the circuit court, shall be held in each county in the

state at least twice in every year, and judges of the several courts mentioned in this section *may hold court for each other when they deem it expedient, and shall do so when directed by law.* * * * " (Emphasis added.)

The public records of this State reflect that the Chief Justice of the Alabama Supreme Court has regularly assigned and continues to assign circuit judges to serve in circuits in which they have never resided and in which, according to the argument advanced by the other Judges of this Court, they have no knowledge of the people or the litigants.[3] How can a circuit judge elected to a circuit situated in the northern part of Alabama effectively serve by assignment as a circuit judge in a circuit situated in the southern part of Alabama? The answer is simple: Because he is under no impediment for not having resided in the circuit to which he is assigned in that he is a resident of the State of Alabama and has met the State durational residency requirement. This is the only requirement as to knowledge of the people and the litigants in which the State can possibly have an interest.[4]

Practically speaking, the election process itself serves to inform the voting populace of the candidates who are running for office in the community. The only way a candidate, especially one who does not reside in the community, can win an election is to campaign. If his campaign is to be successful, the candidate must familiarize himself with the important issues in the community and gain the trust and confidence of the people.

Furthermore, there are enough safeguards inherent in the political system to protect the voters from a dishonest candidate. First, as noted above, a candidate for the office of circuit judge must be a member of the Alabama Bar, which means that he must have satisfied the strict standards of the Bar's ethics committee. Secondly, most candidates for the office of circuit judge will have been nominated by an established political party which will, most likely, have screened the candidate before nominating him. Third, the nonresident candidate will probably have an opponent who will be only too pleased to publicize the fact that the candidate is a "strang-

---

3. Summary of assignments for circuit judges, State of Alabama—circuit judges assigned to serve in circuits other than the circuit in which they were elected:

| 1960 | | 1966 | |
|------|--|------|--|
| 41 | through 12–16–60 | 57 | through 12–12–66 |
| 1961 | | 1967 | |
| 38 | through 12–18–61 | 54 | through 12–12–67 |
| 1962 | | 1968 | |
| 26 | through 12–12–62 | 59 | through 12–30–68 |
| 1963 | | 1969 | |
| 39 | through 12–17–63 | 80 | through 12–17–69 |
| 1964 | | 1970 | |
| 52 | through 12–16–64 | 55 | through 10–6–70 |
| 1965 | | | |
| 65 | through 12–30–65 | | |

It should be noted that of a total of 37 judicial circuits in Alabama, there were 80 such assignments in the calendar year 1969!

---

4. A number of States, for example, do not require judges of trial courts of general jurisdiction to reside in the district to which they are elected for any period prior to their election. As does Alabama, most of these States require that these candidates reside *in the State* for a specified period. See, e. g., Ariz.Const. Art. VI, § 22, A.R.S.; Fla.Const. Art. V, § 13A, F.S.A.; Ga.Code Ann. §§ 2–4801 and 24–2603; Miss.Const. Art. VI, § 154; W.Va.Const. Art. 8, § 10, and W. Va.Code § 51–2–8.

er" to the community. The local media will also be only too willing to "expose" the nonresident candidate if it finds him to be unfit for the office of circuit judge.

Finally, even if the State were to show a compelling interest in giving the voters an opportunity to familiarize themselves with the candidate, a 12-month pre-election residence requirement is not necessary to promote this interest. See Shapiro v. Thompson, 394 U.S. 618, 631, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). These provisions create a nonrebuttable presumption, which the other Judges of this Court seem to accept, that the voters of a community will not be acquainted with the qualifications of a candidate who does not reside in the circuit and that a candidate who does not reside in the circuit will not be familiar with the people or their problems. All one has to do is look to the facts of this case to see that this presumption is unsupportable.

The Seventeenth Judicial Circuit is composed of three counties—Greene, Sumter and Marengo—all of which are predominantly Negro. There are approximately twenty attorneys who reside and practice in the Seventeenth Judicial Circuit; all of these attorneys are white. Drake has set forth in his pleadings, and defendants have not controverted, the fact that he is the only attorney who works closely with the blacks. From this it would appear that Drake would better understand the problems of the people who reside in the Seventeenth Judicial Circuit than any of the resident attorneys.

The following language from Kramer v. Union Free School District, supra, is especially germane to the case at hand:

"For, assuming, arguendo, that New York legitimately might limit the fran-chise in these school district elections to those 'primarily interested in school affairs,' close scrutiny of the § 2012 classifications demonstrates that they do not accomplish this purpose with sufficient precision to justify denying appellant the franchise.

"Whether classifications allegedly limiting the franchise to those resident citizens 'primarily interested' deny those excluded equal protection of the laws depends, inter alia, on whether all those excluded are in fact substantially less interested or affected than those the statute includes. In other words, the classifications must be tailored so that the exclusion of appellant and members of his class is necessary to achieve the articulated state goal. Section 2012 does not meet the exacting standard of precision we require of statutes which selectively distribute the franchise. The classifications in § 2012 permit inclusion of many persons who have, at best, a remote and indirect interest, in school affairs and, on the other hand, exclude others who have a distinct interest in the school meeting decisions." 395 U.S. at 632, 89 S.Ct. at 1892.

I would, therefore, declare those portions of Article VI of the Alabama Constitution and Title 13, Section 176, of the Alabama Code which impose a 12-month pre-election residency requirement on candidates for the office of circuit judge unconstitutional as violative of the Fifteenth Amendment and the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. Therefore, I dissent from that part (IV) of the opinion of this Court that holds otherwise.

I concur in the remainder of the opinion.