Beverley R. **WELLFORD**, Plaintiff,

v.

Basil R. **BATTAGLIA**, in his capacity as Chairman of the Republican City Committee, et al., Defendants.

Civ. A. No. 4327.

United States District Court,
D. Delaware.

May 23, 1972.

R. Franklin Balotti, of Richards, Layton & Finger, Wilmington, Del., for plaintiff.

Basil R. Battaglia, pro se.

Kent Walker, and Richard S. Gebelein, Dept. of Justice, Wilmington, Del., for defendants Members of the Board of Elections.

## OPINION

STAPLETON, District Judge.

Plaintiff, a registered voter and a would-be candidate for the office of Mayor of the City of Wilmington, here attacks the constitutionality of Section 3–300 of the Charter of that city, which provides:

"The mayor shall have been a resident of the city for at least five years preceding his election and shall be at least thirty years of age at the time of his election."

The case is currently before me on cross-motions for summary judgment, both sides having taken the position that there is no dispute as to any material fact. This Court has jurisdiction by virtue of 42 U.S.C. § 1983 and 28 U.S.C. § 1343.

As of the next mayoralty election, plaintiff will have been a resident of Wilmington, Delaware, for four years.

In all respects other than durational residency, he would be qualified to serve as Mayor if elected. Plaintiff is ready, willing and able to perform all acts necessary to be placed upon the ballot. His request for a position on the ballot has been denied by the Department of Elections, however, on the following grounds:

"The opinion rendered by the Attorney General rests on Section 3–300 of the Home Rule Charter of the City of Wilmington which requires that the Mayor shall have been a resident of the City of Wilmington for at least 5 years preceding his election. A candidate for the office of Mayor must also have the same residency requirements as the Mayor. The opinion also indicates that this requirement is constitutional. Therefore, this Department cannot place your name on the ballot as a candidate for Mayor of the City of Wilmington." [1]

Under the Charter, the Mayor is the chief executive officer of the city. There is no durational residency requirement with respect to any other office in the executive branch of city government. One year's residence is required for City Councilmen. Elections for the office of Mayor are held every four years.

Wilmington has a population of approximately 80,000 and covers an area of approximately 15.77 square miles. It is located in New Castle County which has a population of approximately 385,000[2] and covers an area of approximately 435 square miles. The population of Wilmington and its suburbs comprises a substantial majority of the county's population and is the only metropolitan area in the county. The county is served by at least three countywide radio stations, a television station and two daily newspapers of general circulation. No data has been supplied to the court which would indicate how many current resi-

---

[1]. Letter dated February 4, 1972, from the President of the Board of Elections of New Castle County. Complaint, Exh. D.

[2]. The 1970 Census figures for Wilmington and New Castle County were 80,386 and 385,856, respectively.

dents of the City of Wilmington have resided there for less than five years and it is unlikely that such data is available. Census figures do indicate, however, that during the period from 1947–1970 an average of approximately 3.3% of the total national population moved interstate each year and that an additional 3.4% of the population moved intrastate each year.[3] In any event, it is clear that a not insubstantial number of Wilmington residents are ineligible to serve as Mayor by virtue of Section 3–300.

▮ Plaintiff's challenge rests upon the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. We start with the settled proposition that while plaintiff has no constitutional right to hold public office, he does have "a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications." Turner v. Fouche, 396 U.S. 346, 362, 90 S.Ct. 532, 541, 24 L.Ed.2d 567 (1970). What constitutes "invidious discrimination" depends upon the context and the United States Supreme Court has, accordingly, evolved more than one test to be applied in passing on challenges of this character. This court must, therefore, first decide upon the appropriate standard of review. Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

▮ The so-called "traditional" or "rational connection" test requires the court to ask only "whether the challenged classification rests on grounds wholly irrelevant to the achievement of a valid state objective." Turner v. Fouche, 396 U.S. 346, 362, 90 S.Ct. 532, 541, 24 L.Ed.2d 567 (1970). The challenged state law is entitled to a presumption of validity and must be allowed to stand unless the one mounting the attack convinces the court either that the law has no permissible objective

or, given a valid objective, that there is no "rational basis" for the means selected." Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).

Some state legislation cannot be sustained, however, unless it "withstand[s] a more rigid standard of review." Bullock v. Carter, supra, 405 U.S. at 142, 92 S.Ct. at 855. The choice of standard depends upon "the interest affected or the classification involved." Dunn v. Blumstein, supra, 405 U.S. at 335, 92 S. Ct. at 999. In general, if the challenged law directly affects a "fundamental" or "basic" right or draws lines which result in a "suspect classification," [4] the burden is upon the proponents of the law to make a "clear showing that the burden imposed is necessary to protect a compelling and substantial governmental interest." Dunn v. Blumstein, supra, 405 U.S. at 341, 92 S.Ct. at 1002. "Necessary," in this context, is interpreted to mean that there is no other alternative available to protect the governmental interest involved which will involve a lesser burden on the right restricted. This, in turn, means that under the more rigid "compelling interest" standard, a challenged law must be precisely tailored to the objective. Even if the classification drawn may have some tendency to promote a permissible interest, the law cannot stand if it "exclude[s] too many people who should not, and need not, be excluded." Dunn v. Blumstein, supra, 405 U.S. at 360, 92 S.Ct. at 1012.

The choice of the appropriate standard is crucial in this case. The governmental interest asserted in support of Section 3–300 is an interest in assuring that the chief executive officer of the City will be knowledgeable about its problems and resources. I consider this a legitimate governmental interest. Moreover, I am unable to say that there is no rational connection between this interest and the five year residency re-

3. U. S. Dept. of Commerce, Bureau Census, Current Population Reports, Population Characteristics, Series P–20, No. 210, Jan. 15, 1971, Table 1, pp. 7–8. Noted in Dunn v. Blumstein, supra, 405

U.S. at 335, n. 5, 92 S.Ct. 995, 31 L.Ed. 2d 274 (1972).

4. E. g., a classification based on race, religion, national origin or personal wealth.

quirement imposed by the City Charter. Considering the excluded and included groups as a whole, it may well be that there are more people qualified by knowledge of the city among those with five years residence than among those with less than five years residence. At the very least, I would be unwilling on the present record to "second guess" the legislative judgment on this point.[5] I conclude, however, that Section 3–300 must meet the more rigid standard of review.

A state law which imposes a direct burden, however small, on the right to vote must clearly be subjected to the "close scrutiny" of the "compelling interest" test. Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Kramer v. Union School District, 395 U.S. 621, 89 S. Ct. 1886, 23 L.Ed.2d 583 (1969); Dunn v. Blumstein, *supra*. The right to hold or run for public office has not as yet been expressly declared by the Supreme Court to have the same status.[6] After so noting, however, the court in *Bullock* proceeded to note the interrelation between restrictions on the right to candidacy and restrictions on the right to vote:

> ". . . the Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review. However, the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters. . . . In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters."

In the *Bullock* case, the Supreme Court applied the compelling interest test to a Texas system of substantial filing fees. It did so for two reasons. First, it found that the size of the fees imposed gave the system "a patently exclusionary character." No alternative means of qualification were provided and the not insubstantial number of potential candidates who, like the plaintiff, could not afford the fee, were therefore absolutely barred from running. "The effect of this exclusionary mechanism on voters . . . [was] neither incidental nor remote" since they were thereby "substantially limited in their choice of candidates." Second, the court found an "obvious likelihood of this limitation falling more heavily on the less affluent segment of the community, whose favorites . . . [might] be unable to pay the large costs required by the Texas system." The court concluded:

> "Because the Texas filing fee scheme has a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting

---

5. The defendants assert two other governmental interests: an interest in having a Mayor who "has more at stake in doing a good job" and an interest in having candidates better known to the electorate. If these were the only interests asserted, I would have grave doubt as to whether Section 3–300 could pass muster even under the "rational connection" test.

6. Present indications, though far from conclusive, are that it may not be accorded such status. In Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1970) the Court sustained the validity of a Georgia statute which required a candidate, who had not won a primary, to submit a nominating petition signed by at least 5% of the number of registered

voters in order to get his name printed on the ballot. The Court did not discuss the choice of the appropriate standard of review. The opinion indicates to me, however, that the "rational connection" test was in fact applied. This view is supported by the Court's invitation in Bullock v. Carter, 405. U.S. 134, at 143, 92 S.Ct. 849 (Feb. 24, 1972) to compare the *Jenness* case with Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) where the compelling interest test was applied. The right to participate in representative government (i. e., the right to vote) does seem to some degree more fundamental than the right to represent others in that process (i. e., the right to serve in public office).

a particular candidate, we conclude, as in *Harper,* that the laws must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster."

■ Unlike the Texas filing fee system and the laws concerning candidacy considered by the Supreme Court in other cases,[7] the burden of Section 3–300 does not fall more heavily on minority economic or political groups. This distinction, while significant, does not render the *Bullock* case inapplicable, however. As I read that case the grounds asserted for utilizing the "compelling interest" test were alternative. Accordingly, where the law in question poses an absolute barrier to the candidacy of a not insubstantial segment of the community and, to that degree, limits the voters in their choice of candidates, the more strict standard of review must be applied. See also Bolanowski v. Raich, 330 F.Supp. 724 (E.D.Mich.1971) (three year residency requirement for Mayor); Zeilenga v. Nelson, 4 Cal.3d 716, 94 Cal. Rptr. 602, 484 P.2d 576 (five year residency requirement for county supervisor); Gangemi v. Rosengard, 44 N.J. 166, 207 A.2d 665 (1965).[8]

■ Moreover, application of the compelling interest test is required in this case for a wholly independent reason. In Dunn v. Blumstein, 405 U.S. 338, 342, 92 S.Ct. at 1001, the Supreme Court recently held as follows:

". . . Tennessee's durational residence laws classify bona fide residents on the basis of recent travel, penalizing those persons, and only those persons, who have gone from one jurisdiction to another during the qualifying period. Thus, the durational residence requirement directly impinges on the exercise of a second fundamental personal right, the right to travel.

. . . . . .

. . . Durational residence laws impermissibly condition and penalize the right to travel by imposing their prohibitions on only those persons who have recently exercised that right. In the present case, such laws force a person who wishes to travel and change residences to choose between travel and the basic right to vote. Cf. United States v. Jackson, 390 U.S. [570] 582–583 [88 S.Ct. 1209, 1216–1217, 20 L.Ed.2d 138] (1968). Absent a compelling state interest, a State may not burden the right to travel in this way."

■ The right to travel referred to by the court in the *Dunn* case is a right to intrastate as well as interstate migration.[9] King v. New Rochelle Municipal Housing Authority, 442 F.2d 646 (2nd Cir. 1971). Moreover, the motive behind a challenged law and its actual

7. *E. g.,* Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) where the court applied the compelling interest test because the Ohio statute involved gave "the two old, established parties a decided advantage over any new parties struggling for existence and thus place[d] substantially unequal burdens on both the right to vote and the right to associate." 393 U.S. at 31, 89 S.Ct. at 10.

8. Prior to Dunn v. Blumstein, *supra,* a number of courts persuasively argued that a direct restriction on the right to vote did not require application of the compelling interest test where the burden did not fall with unequal weight on minority interests. *E. g.,* Howe v. Brown, 319 F.Supp. 862 (N.D.Ohio 1970) (applying the rational connection test and sustaining an Ohio one year residency requirement for voting). This distinction has been laid to rest, however, in the *Dunn* case where the Supreme Court applied the compelling interest test and struck down a Tennessee statute requiring residency in the state for one year and in the county for three months as prerequisites for registration to .vote.

9. Travel, in this sense, apparently means migration with intent to settle and abide, not mere movement. Accordingly, a residency requirement as opposed to a *durational* residency requirement, where only the constitutional right to travel is involved, might not require application of the compelling interest test. See Cole v. Housing Authority of City of Newport, 435 F.2d 807 (1st Cir. 1970).

effect on the right to travel are not relevant considerations in determining the appropriate standard of review. If the statute places a penalty on migration, it does not matter whether the legislature intended to deter travel or whether the penalty in fact has that effect. Dunn v. Blumstein, *supra*, 405 U.S. at 339–341, 92 S.Ct. 995.

Section 3–300 classifies bona fide residence on the basis of recent travel, penalizing those persons and only those persons who have recently exercised their constitutional right of migration. For this reason alone it must meet the compelling interest test.

Guidance for the proper application of the compelling interest test is found in two Supreme Court cases dealing with state legislation restricting the franchise. In Kramer v. Union School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L. Ed.2d 583 (1969), the court applied this test in passing upon a New York statute which restricted those entitled to vote in school district elections to parents and owners or lessees of real estate. The court there concluded:

".  .  . assuming, *arguendo*, that New York legitimately might limit the franchise in these school district elections to those 'primarily interested in school affairs,' close scrutiny of the § 2012 classifications demonstrates that they do not accomplish this purpose with sufficient precision to justify denying appellant the franchise.

Whether classifications allegedly limiting the franchise to those resident citizens 'primarily interested' deny those excluded equal protection of the laws depends, *inter alia*, on whether all those excluded are in fact substantially less interested or affected than those the statute includes. In other words, the classifications must be tailored so that the exclusion of appellant and members of his class is necessary to achieve the articulated state goal. Section 2012 does not meet the exacting standard of precision we require of statutes which

selectively distribute the franchise. The classifications in § 2012 permit inclusion of many persons who have, at best, a remote and indirect interest, in school affairs and, on the other hand, exclude others who have a distinct and direct interest in the school meeting decisions.

Nor do appellees offer any justification for the exclusion of seemingly interested and informed residents—other than to argue that the § 2012 classifications include those 'whom the State could understandably deem to be the most intimately interested in actions taken by the school board,' and urge that 'the task of .  .  . balancing the interest of the community in the maintenance of orderly school district elections against the interest of any individual in voting in such elections should clearly remain with the Legislature.' *But the issue is not whether the legislative judgments are rational. A more exacting standard obtains. The issue is whether the § 2012 requirements do in fact sufficiently further a compelling state interest to justify denying the franchise to appellant and members of his class. The requirement of § 2012 are not sufficiently tailored to limiting the franchise to those 'primarily interested' in school affairs to justify the denial of the franchise to appellant and members of his class.*" (Emphasis supplied). 395 U.S. at 632–633, 89 S. Ct. at 1892.

More recently, the Supreme Court followed a similar approach in striking down Tennessee's durational residence requirements for voting. Dunn v. Blumstein, *supra*. The court there held:

"Similarly, the durational residence requirements in this case founder because of their crudeness as a device for achieving the articulated state goal of assuring the knowledgeable exercise of the franchise. The classifications created by durational residence requirements obviously permit any long-time resident to vote regardless of his knowledge of the issues—

and obviously many long-time residents do not have any. On the other hand, the classifications bar from the franchise many other, admittedly new, residents who have become minimally, and often fully, informed about the issues. Indeed, recent migrants who take the time to register and vote shortly after moving are likely to be those citizens, such as appellee, who make it a point to be informed and knowledgeable about the issues. Given modern communications, and given the clear indication that campaign spending and voter education occur largely during the month before an election, the State cannot seriously maintain that it is 'necessary' to reside for a year in the State and three months in the county in order to be minimally knowledgeable about congressional, state or even purely local elections.   . . .

. . . . .

*It may well be true that new residents as a group know less about state and local issues than older residents; and it is surely true that durational residence requirements will exclude some people from voting who are totally uninformed about election matters. But as devices to limit the franchise to minimally knowledgeable residents, the conclusive presumptions of durational residence requirements are much too crude. They exclude too many people who should not, and need not, be excluded.   . . .* By requiring classifications to be tailored to their purpose, we do not secretly require the impossible. *Here, there is simply too attenuated a relationship between the state interest in an informed electorate and the fixed requirement that voters must have been residents in the State for a year and the county for three months.* Given the exacting standard of precision we require of statutes affecting constitutional rights, we cannot say that durational residence requirements are necessary to further a compelling state interest." 405 U.S. at 357, 92 S.Ct. at 1011. (Emphasis supplied).

■ The *Kramer* and *Dunn* cases assumed a legitimate governmental interest and a rational relationship between the challenged law and the permissible objective. They dictate, however, that courts in cases of this kind decide whether the relationship between the law and the legislative classification is "too attenuated" to justify the burden upon the fundamental right of citizens to vote for the candidate of their choice. The question, accordingly, is one of degree—one of line drawing in an area where reasonable men may differ.[10] Such questions are often by their nature difficult to decide. Here, however, given the undisputed facts and the legally controlling precedents, I believe the answer is relatively clear.[11] Section 3–300 of the Charter of the City of Wilmington does not pass constitutional muster.

Section 3–300 bars mayoralty candidacy for a substantial number of residents of the city. Depending upon when a resident establishes Wilmington as his home, he or she must wait five to nine years before the electorate may have the opportunity to pass upon his or her ideas and talents.[12] The question is whether this is necessary or whether

---

10. The court in the *Dunn* case, for example, while declaring that Tennessee's one year in the state and ninety days in the county requirements are unconstitutional, clearly indicated that the relationship between the state's legitimate interests and a thirty day residence requirement would not be "too attenuated." Dunn v. Blumstein, *supra,* (Concurring Opinion of Justice Blackmun).

11. I need not decide whether legislation of the kind here involved must literally include *all* knowledgeable candidates among the ranks of the eligible and exclude none, compare Bolanowski v. Raich, 330 F.Supp. 724 (E.D.Mich.1971), or whether the compelling interest test if so construed "secretly require[s] the impossible." See Dunn v. Blumstein, *supra,* (Dissenting Opinion of Chief Justice Burger).

12. In Mr. Wellford's case the period would be eight years.

some alternative approach or shorter durational residence requirement would suffice to provide reasonable assurance of well informed candidates.

Wilmington, while burdened to some degree with the same problems as other urban communities, is relatively small in population and area. One willing to undertake trial by campaign and thereafter to shoulder the weighty responsibilities of the office of Mayor, if elected, gives convincing evidence of his interest in community affairs by his decision to seek the office. Given a person with this interest, the available news coverage in the community is clearly sufficient to provide a would-be mayor with the resource material necessary to become relatively well informed in substantially less than five years. Beyond this limited assurance of knowledgeability, the durational residence approach to the matter is, in the language of the Supreme Court, "too crude," and the price simply too high in terms of the number of otherwise qualified candidates excluded. Reliance must be placed on the cornerstone of representative government, the collective judgment of the electorate, rather than on a legislative solution which substantially restricts that electorate in its choice of leadership. *Cf.* Bullock v. Carter, *supra*; Bolanowski v. Raich, 330 F.Supp. 724 (E.D.Mich. 1971); Zeilenga v. Nelson, 4 Cal.3d 716, 94 Cal.Rptr. 602, 484 P.2d 378 (1970); Gangemi v. Rosengard, 44 N.J. 166, 207 A.2d 665 (Sup.Ct.1965).[13]

Plaintiff's motion for summary judgment must be granted.

Submit order.

---

13. Defendants correctly point out that the Constitution of the United States requires that the President of the United States be a resident of the United States for fourteen years. Art. 2, § 1, Constitution of the United States. In view of the dramatic distinction between the practical significance of national and city boundaries, however, I find the suggested analogy unhelpful in determining the issue presently before this Court.