**Jesse H. WALKER, Plaintiff,**

v.

**Joseph S. YUCHT et al., Defendants.**

**Civ. A. No. 4483.**

United States District Court,
D. Delaware.

Dec. 6, 1972.

Charles F. Richards, Jr., and F. Franklin Balotti of Richards, Layton & Finger, Wilmington,. Del., for plaintiff.

Kent F. Walker, State Sol. and Richard S. Gebelein, Deputy Atty. Gen., Wilmington, Del., for defendants.

Before ADAMS, Circuit Judge, and LATCHUM and STAPLETON, District Judges.

## OPINION

ADAMS, Circuit Judge.

This case places before us the constitutionality of Delaware's durational residency requirement for persons desiring to be candidates for the office of State Representative.[1]

The facts are undisputed. Plaintiff is a candidate for the office of Representative to Delaware's General Assembly from the Third Representative District. The defendants are the Board of Elections and Department of Elections of New Castle County, Delaware.

The plaintiff resides in the City of Wilmington and in the Third Representative District, where he moved approximately 17 months ago from the State of Georgia. Having been selected by primary election on August 19, 1972 to be his party's candidate for State Representative, the plaintiff was placed on the ballot for the general election to be held November 7, 1972. On October 6, 1972, the Attorney General of Delaware ordered that the plaintiff's name be re-

1. The Delaware Constitution of 1897, as amended, provides:

"No person shall be a Representative who shall not have attained the age of twenty-four years, and have been a citizen and inhabitant of the State three years next preceding the day of his election, and the last year of that term an inhabitant of the Representative District in which he shall be chosen, unless he shall have been absent on the public business of the United States or of this State." Dela. Const. art. 2, § 3, Del.C.Ann.

moved from the ballot for the upcoming election because of his failure to meet the state's durational residency requirement.[2]

Plaintiff then instituted this suit, seeking a declaratory judgment that Delaware's durational residency requirement is unconstitutional and an injunction against his removal from the ballot. The parties filed cross-motions for summary judgment. After the defendants decided to comply with the Attorney General's order directing removal of plaintiff's name from the ballot, the court entered a temporary restraining order against such action. Because of the nature of this suit, a three-judge federal district court was convened, pursuant to 28 U.S.C. § 2283. Hearing and argument on the cross-motions for summary judgment and on plaintiff's prayers for preliminary and final injunctive relief were held on October 20, 1972. In view of the impending election, this Court was impelled to decide the case the same day it heard argument. It denied plaintiff's motion and granted defendants' motion for summary judgment.[3]

The principal contention asserted by plaintiff is that Delaware's durational residency requirement violates the equal protection clause of the fourteenth amendment of the Constitution by creating distinct classes of old and new residents and by providing only for the former the opportunity to run for political office.

In addressing the constitutional question presented here, we must first ascertain the appropriate equal protection standard to apply in this case.[4]

■■ The Supreme Court has developed two distinct tests for determining whether particular state action unconstitutionally classifies.[5] Under the traditional test, state action will survive an equal protection attack if the classification has a "reasonable basis" for, or is "rationally related" to, the achievement of a legitimate state goal.[6] When state action affects some "fundamental right," [7] however, or if the state's classification is based upon "suspect" criteria,[8] a different, more stringent, constitutional standard is applied. Under this more rigorous test, in the absence of a "compelling interest," the state's classification is unconstitutional.[9]

2. *See id.*

3. After the decision of this Court granting defendants' motion for summary judgment was rendered, plaintiff applied for, and was granted by Mr. Justice Brennan, a stay of this Court's judgment pending appeal to the Supreme Court. On November 7, 1972, the plaintiff was defeated in his bid for election. Whether under these circumstances the case is now moot is a question not before us, because this Court's decision was rendered from the bench on the day of argument while the controversy involving the plaintiff was clearly "live."

4. Bullock v. Carter, 405 U.S. 134, 142, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).

5. *See, e. g.*, Dunn v. Blumstein, 405 U.S. 330, 335, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Bullock v. Carter, 405 U.S. 134, 142, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) (per curiam); Developments in the Law— Equal Protection, 82 Harv.L.Rev. 1065 (1969).

6. *See, e. g.*, Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); McDonald v. Board of Election Comm'rs, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); Rapid Transit Corp. v. City of New York, 303 U.S. 573, 578, 58 S.Ct. 721, 82 L.Ed. 1024 (1938).

7. *E. g.*, Shapiro v. Thompson, 394 U.S. 618, 638, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

8. *See* Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (dictum); *cf.* Shapiro v. Thompson, 394 U.S. 618, 658–659, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1960) (Harlan, J. dissenting).

9. *E. g.*, Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("carefully and meticulously" scrutinize).

Plaintiff asserts that Delaware's durational residency requirement hinders fundamental rights of voting, candidacy, and interstate travel and that the Court must, therefore, test the state classification under the compelling interest standard. For the reasons that follow, this Court disagrees. We hold instead that the durational residency requirement here need only be measured against the traditional equal protection test and that, under this calculus it is not unconstitutional.[10]

## I. *Identifying Protected Interests* [11]

### A. *Political Candidacy*

Although it has never recognized the right to run for public office as fundamental, the Supreme Court has ruled that those aspiring to become candidates for public office are entitled to equal protection of the laws. In Turner v. Fouche,[12] the Court held that a Georgia statute restricting school board membership to freeholders (those owning real property) violates the fourteenth amendment:

"[T]he appellants and the members of their class do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications. The State may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees." [13]

Finding it unnecessary to determine whether the state must show a compelling interest to justify candidacy restrictions,[14] the Court rejected the argument that a person "must . . . own real property if he is to participate responsibly in educational decisions." [15] Although the Court asserted that "it seems impossible to discern any interest the qualification can serve," [16] *Turner's* holding is obviously based upon a more severe standard than the traditional "rational relation" equal protection test.[17] Whereas in earlier cases and in other contexts the Court has been willing to accept as constitutional classifications imperfectly drawn,[18] in *Turner* the re-

---

10. We are, of course, aware that this is not the first case in which constitutional attack has been leveled upon durational residency requirements for political candidates. *See, e. g.* Green v. McKeon, 468 F. 2d 883 (6th Cir., filed Oct. 12, 1972) (unconstitutional) affg. 335 F.Supp. 630 (E.D.Mich.1971); Draper v. Phelps, 351 F.Supp. 677 (W.D.Okl., filed Sept. 6, 1972) (3-judge court) (constitutional); McKinney v. Kaminsky, 340 F.Supp. 289 (M.D.Ala.1972) (same); Mogk v. City of Detroit, 335 F.Supp. 698 (E.D.Mich. 1971) (3-judge court) (same); Hadnott v. Amos, 320 F.Supp. 107, 119–123 (N.D. Ala.1970) (3-judge court) (unconstitutional), affd without opinion, 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971). In addition, Judge Stapleton, in Wellford v. Battaglia, 343 F.Supp. 143 (D. Del., filed May 23, 1972) held that a five year durational residency requirement, imposed upon would-be candidates for the office of Mayor of Wilmington by that city's Charter, violated the Constitution. Although we are naturally impressed by Judge Stapleton's well-reasoned and articulate approach, this Court is not persuaded that the *Wellford* case forecloses our examination of the thorny constitutional issues presented here.

11. For the analytical framework upon which much of the case examination in Parts A. and B., *infra*, is based, see Comment, The Constitutionality of Qualifying Fees for Political Candidates, 120 U.Pa.L. Rev. 109 (1971) [hereinafter cited as Comment].

12. 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970).

13. *Id.* at 362–363, 90 S.Ct. at 541 (footnotes omitted).

14. *Id.* at 362, 90 S.Ct. 532.

15. *Id.* at 363–364, 90 S.Ct. at 542.

16. *Id.* at 363, 90 S.Ct. at 542. *But cf.* Harper v. Virginia Bd. of Elections, 383 U.S. 663, 684–685, 86 S.Ct. 1079, 16 L. Ed.2d 169 (1966) (Harlan, J., dissenting).

17. *See* Comment, *supra* note 15, at 116.

18. *See* Dandridge v. Williams, 397 U.S. 471, 484, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); Railway Express Agency v. New York, 336 U.S. 106, 69 S.Ct. 463, 93 L. Ed. 533 (1949); Goesaert v. Cleary, 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163 (1948); Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L. Ed. 369 (1911).

striction on political candidacy was struck down because of its over-inclusive nature:

> "Whatever objectives Georgia seeks to obtain by its 'freeholder' requirement must be secured, in this instance at least, by means more finely tailored to achieve the desired goal." [19]

More recently, in Bullock v. Carter,[20] the Supreme Court again had occasion to consider the constitutionality of state restrictions upon the opportunity to run for public office, this time in the setting of a Texas arrangement imposing upon those desiring to run in a political primary the requirement of first paying a substantial filing fee.[21] Noting that the "threshold question" was which equal protection standard to apply,[22] the Court asserted that it had not "heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review." [23]

The Court did recognize, however, that "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." [24] Holding that "the existence of [barriers to candidate access to the primary ballot] does not of itself compel close scrutiny," [25] the Court, because of Harper v. Virginia Board of Elections,[26] thought it "essential to examine in a realistic light the extent and nature of [candidacy-restriction] impact on voters." [27] On the basis of its examination, the Court concluded that the Texas filing fee arrangement was unconstitutional.

■ Neither *Turner* nor *Bullock* supports recognition of a right to run for political office sufficiently fundamental, in and of itself, so as to require, in any attempt to justify candidacy restrictions, the demonstration of a compelling state interest. Instead, we read *Turner* as establishing by square holding no more than the principle that a state may not distribute the opportunity to run for office on the basis of property ownership or wealth.[28] The classification's overinclusive nature, found to be determinative by the Court in striking down Georgia's statute, resulted from the nature of the *criterion* by which the state chose to classify—property ownership— not from the nature of the particular *interest* burdened—political candidacy. Our conclusion that the *Turner* rationale pivots upon the nature of the criterion by which the state chose to classify finds cogent support in the Supreme Court's later statements in *Bullock* that (1) "the Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review," with a *"Cf."* citation to Turner v. Fouche [29] and (2) that "[the] existence of [candidacy] barriers does not of itself compel close scrutiny." [30] Under these circumstances, and in light of the Supreme Court's apparent rejection of the argument in *Bullock,* we ought not assume that such a fundamental right of candidacy exists.

■ The *Bullock* case does, however, recognize that restrictions on candidacy may affect the right to vote, a right that has been accorded fundamental status. In order to determine which test to apply in assessing the constitutionality

19. 396 U.S. at 364, 90 S.Ct. at 542.

20. 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed. 2d 92 (1972).

21. The Texas fees ranged as high as $8,900. 405 U.S. at 138 n. 10, 92 S.Ct. 849.

22. *Id.* at 142, 92 S.Ct. 849.

23. *Id.* at 142–143, 92 S.Ct. at 855.

24. *Id.* at 143, 92 S.Ct. at 856.

25. *Id.*

26. 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed. 2d 169 (1966) (holding Virginia's general poll tax unconstitutional).

27. 405 U.S. at 143, 92 S.Ct. at 856.

28. *Cf.* Comment, *supra* note 15, at 118.

29. 405 U.S. at 142–143 & n. 19, 92 S.Ct. at 855.

30. *Id.* at 143, 92 S.Ct. at 856.

of durational residency requirements on candidacy, the analysis must now, in following the Supreme Court's lead, "examine in a realistic light the extent and nature of [the] impact on voters [of such requirements]." [31]

B. *The Right to Vote: The Relationship Between Voting and Candidacy* [32]

In Harper v. Virginia State Board of Elections,[33] the Supreme Court held that the equal protection clause forbids states from placing a price tag on the right to vote. There, Virginia had employed a statutory plan under which voters had the choice of paying a $1.50 general poll tax or suffering disenfranchisement for failure to pay. Noting that by imposing a poll tax the state had created a classification whereby "the affluence of the voter or payment of any fee" became "an electoral standard," [34] the Court held the requirement an "invidious discrimination" contravening the Fourteenth Amendment.

The effect of Virginia's poll tax upon the right to vote was, of course, direct. Those who refused or were unable to pay the tax were denied the opportunity to exercise the franchise. In Dunn v. Blumstein,[35] the Supreme Court confronted another "either-or" state system affecting the right to vote. Tennessee, in *Dunn*, provided that only those residents who had lived in the state for twelve months, and for three months in the particular county where they planned to vote, could exercise the franchise. Thus, a resident desiring to vote had to fulfill the durational residency requirement. If he satisfied the re-

quirement, he could vote; if not, he could not vote at all. "Durational residence requirements *completely bar from voting* all residents not meeting the fixed durational standards." [36] Basing its decision, in part, upon "the benefit withheld by the classification (the opportunity to vote)," [37] the Court found the durational residence requirements, under the compelling interest test, violative of the equal protection clause.

In the present case, the impact, if any, of Delaware's durational residency requirement for candidates upon the right to vote is less direct than the impacts of the burdens in *Harper* and *Dunn*.[38] This is so because the present case does not involve a factual situation in which the state denies, completely, the right to vote to those failing to fulfill a prescribed condition—payment of a fee or length of residency. What is *directly* restricted here is essentially candidacy, not voting.

■ Restrictions upon candidacy may, however, affect the right to vote and, to the extent they do, must be subjected to appropriate scrutiny.

In Williams v. Rhodes,[39] for example, the Supreme Court examined a statutory election mechanism by which Ohio "made it virtually impossible for a new political party, even though it has hundreds of thousands of members, or an old party, which has a very small number of members, to be placed on the state ballot [for presidential electors]." [40] The state's election laws placed numerous obstacles in the way of political parties that had failed to receive at least 10 per cent of the votes cast in

---

31. *Id.*

32. *See* note 15, *supra.*

33. 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed. 2d 169 (1966).

34. *Id.* at 666, 86 S.Ct. at 1081.

35. 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

36. *Id.* at 336, 92 S.Ct. at 999.

37. *Id.* at 335, 92 S.Ct. at 999. In addition, the Court held that the basis of the state's classification (recent interstate travel) also mandated application of the compelling interest test. *See* text accompanying note 58 et seq., *infra.*

38. *Cf.* Comment, *supra* note 15, at 121.

39. 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

40. *Id.* at 24, 89 S.Ct. at 7.

the previous gubernatorial election—virtually all parties except the Democratic and Republican. To gain ballot placement, disfavored parties were required to maintain a complex party organization and to present a petition containing signatures equalling 15 per cent of the votes cast in the last election. Striking down, under the fourteenth amendment, Ohio's election laws, the Court concluded:

> "[T]he state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." [41]

*Williams* is significant, in the matrix of the present case, primarily because the Court there explicitly recognized the existence of a right to vote "effectively." Unlike *Harper* and *Dunn*, the laws implicated in *Williams* did not directly burden the right to vote, i. e., the right to cast a ballot. The Court perceived, however, that to be of significance in a democratic society the right to vote must mean something more than the opportunity to cast a ballot: [42] "The right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." [43] In the Court's view, then, Ohio's election laws went beyond the point at which state restrictions on candidacy make meaningless the right to vote.

■ However, *Williams* does not hold that the right to vote effectively is burdened, in any constitutionally relevant sense, by *all* candidacy restrictions. The right to vote effectively cannot mean, for instance, the absolute right to be presented with an "acceptable" list of candidates—a list offering every voter a candidate acceptable to him. And once it is admitted that the asserted right is not absolute, candor requires recognizing the necessity of drawing lines.

At the present time, it is neither necessary nor appropriate to define with precision the contours of the "right to vote effectively." Obdurate definitions of such abstract concepts may often do more harm than good. To define is to limit the infinite; it implies determining now the exact meaning of a given term. But, a definition, although at present perhaps a guide, may tomorrow become a jailer. Especially in cases requiring constitutional adjudication, defining a right, after ascribing to it constitutional status, freezes the opportunity of an informed electorate to experiment in determining how best to govern itself. Defining a right with precision today is to imply a power to see into the future, an ability that federal courts, at least, cannot and do not pretend to have.

We conclude, simply, that whatever the "right to vote effectively" may mean at another time and in a different case, it does not mean, certainly in the context of this case, what the plaintiff asserts. This conclusion is buttressed by the Supreme Court's treatment, in Bullock v. Carter,[44] of the relationship between restrictions on candidacy and the right to vote.

As noted above, the Court in *Bullock* invalidated Texas' filing fee system not because of its effect, per se, on the opportunity to run for public office, but because of its effect on the right to vote. After examining the impact of the fee arrangement on the right to vote, the Court concluded that, on the basis of *Harper,* "the laws must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster." [45] The Court in *Bullock* grounded its decision primarily on three factors: (1) the "patently exclusionary character" of the fee

---

41. *Id.* at 30, 89 S.Ct. at 10.

42. *See* Comment, *supra* note 15, at 123.

43. 393 U.S. at 31, 89 S.Ct. at 11.

44. 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).

45. *Id.* at 144, 92 S.Ct. at 856.

program, as evidenced by the "very size of the fees;" (2) "the obvious likelihood that the [limited choice of candidates resulting from imposition of the fees] would fall more heavily on the less affluent segment of the community;" and (3) the fact that the impact of the fee scheme was "related to the resources of the voters supporting a particular candidate." [46]

Each of the reasons that formed the foundation upon which the Supreme Court built its conclusion that imposing large fees upon candidates unconstitutionally impinges upon the right to vote, relates to the intersection of voting and candidacy. Unlike *Harper* or *Dunn*, but comparable to *Williams*, Texas denied no one, in *Bullock*, the right to vote, nor did it impose discriminatory conditions upon exercise of the franchise.

■ Rather, "[t]he initial and direct impact of filing fees [was] felt by aspirants for office, rather than voters . . . ." [47] In merely seeking to limit the size of its ballot (to narrow the field of candidates from among whom the voters could choose) Texas had not run afoul of the Constitution. For example, a requirement that those seeking to become candidates first file a nominating petition also limits the size of the ballot, denies to some the chance to run for office, and narrows voter-choice. Yet, such a practice is not unconstitutional.[48]

*Bullock*, then, must rest upon something other than the Texas filing fee system's effect of limiting voter-choice. The anatomy of the reasons upon which the Supreme Court based the result indicates that *Bullock* turned upon the *way* Texas limited voter-choice. The size of the fees suggested that a particular, discrete class of voters—the poor—would

be adversely affected by such a candidacy requirement. True, not all indigent voters desire to cast their ballots for penurious candidates, but it is not unlikely that many do. And to the extent they do so desire, such voters would probably be unable to help their candidate surmount the hurdle of paying a large fee. As the Court asserted: the impact of the Texas scheme was "related to the resources of the voters supporting a particular candidate." [49]

■ Viewed in this perspective, *Bullock* is merely a new application of the general axiom that statutory arrangements colliding with the right to vote in such way as to burden the voting power of discrete minority groups must be closely scrutinized.[50] In such cases, it is not that the state has limited voter-choice, but the means by which such limitation has been implemented, that is determinative.

Here, as in *Bullock*, Delaware has limited the field of candidates available to the voters. To the extent a Delaware voter desires to vote for a new resident, he will be unable to vote for a candidate of his own choosing. Unlike *Bullock*, the impact of the candidacy restriction here is unrelated to the wealth of the aspiring candidate or that of the voters supporting him. In addition, there is no evidence in this case or any reason to assume that any group of voters would prefer, in general, to vote for a new resident. Thus, no discrete class of voters is prejudiced by Delaware's durational residency requirement.

Under these circumstances, we are not persuaded that whatever impact upon voting the candidacy restriction involved here may have must be measured against the dictates of the compelling state interest test.[50a]

46. *Id.* at 143–144, 92 S.Ct. at 856.

47. *Id.* at 142, 92 S.Ct. at 855.

48. Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).

49. 405 U.S. at 144, 92 S.Ct. at 856.

50. *Cf.* Harper v. Virginia Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16

L.Ed.2d 169 (1966); Comment, *supra* note 15, at 119–21.

50a. *See* McDonald v. Board of Election Comm'rs, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); Williams v. Osser, 350 F.Supp. 646 (E.D.Pa., filed Oct. 19, 1972) (3-judge court); Fidell v. Board of Elections, 343 F.Supp. 913

### C. *The Right to Interstate Travel*

Our conclusion that plaintiff's contentions based upon voting and candidacy interests do not require application of the compelling interest test does not empty his constitutional arsenal. Indeed, he now argues, in reliance upon Shapiro v. Thompson [51] and Dunn v. Blumstein,[52] that Delaware's durational residency requirement burdens the right to travel interstate and, for this reason, requires a stringent standard of equal protection review.

In *Shapiro*, the Supreme Court examined the constitutionality of state and federal action denying welfare assistance to residents who, although meeting all other eligibility requirements, had not fulfilled a one-year durational residency prerequisite. Noting that the effect of the statutes was to create two classes of needy persons, the Court asserted that, on the basis of the waiting period requirement:

"the first class is granted and the second class is denied welfare aid upon which may depend the ability of the families to obtain the very means to subsist—food, shelter, and other necessities of life." [53]

In striking down the legislation, however, the Court appears to have rested its decision not upon the nature of the benefit withheld—welfare—but upon the criterion used to classify—recent interstate travel:

"The waiting-period provision denies welfare benefits to otherwise eligible applicants solely because they have recently moved into the jurisdiction. But in moving from State to State or to the District of Columbia appellees were exercising a constitutional right, and any classification which serves to

penalize the exercise of that right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional." [54]

Unable to find such a compelling interest, the Court held the durational residency requirement there violative of the equal protection clause.

Although any durational residency requirement will, to some extent at least, burden the right to travel interstate, the Court, in a footnote, revealed its reluctance to suggest that a blanket prohibition would apply to all such requirements:

"We imply no view of the validity of waiting-period *or* residence requirements determining eligibility to vote, eligibility for tuition-free education, to obtain a license to practice a profession, to hunt or fish, and so forth. Such requirements may promote compelling state interests on the one hand, or, on the other, may not be penalties upon the exercise of the constitutional right of interstate travel." [55]

The footnote indicates that application of the interstate-travel-ergo-compelling-interest-test rationale of *Shapiro* may depend upon the nature of the benefit that the state is providing to some while withholding from others. The first sentence of the footnote relates solely to the type of benefit the state conditions upon length of residency. The inference, of course, is that a different equal protection test may apply when "less fundamental" interests, such as hunting or fishing, are involved. The Court merely underscored such implication by asserting that, as applied to other interests, durational residency requirements may not be "penalties" upon interstate travel.

In its statement that durational residency requirements may, in other set-

(E.D.N.Y.1972) (3-judge court), affd. without opinion, 409 U.S. 972, 93 S.Ct. 310, 34 L.Ed.2d 236 (1972).

51. 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed. 2d 600 (1969).

52. 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

53. 394 U.S. at 627, 89 S.Ct. at 1327.

54. *Id.* at 634, 89 S.Ct. at 1331.

55. *Id.* at 638 n. 21, 89 S.Ct. at 1333.

tings, not penalize interstate travel, *Shapiro* implicitly recognized that the term "penalty," in any constitutionally relevant sense, may not be a "black or white" word. In fact, any durational residency requirement means that at least some people will have to choose between interstate travel and receiving, immediately upon arrival, a benefit the state of their new residence provides to others. In this sense, such a requirement is always a "penalty" upon exercising the right to travel interstate. Asserting that as applied to other state benefits a durational residency requirement might not burden interstate travel, the Court appears to indicate that merely imposing upon would-be migrant residents of other states the burden of choosing between moving and immediate receipt of a benefit is not necessarily *the kind of "penalty"* per se requiring application of the compelling state interest test.

"Penalties" of course do not burden *rights;* they burden *people* desirous of exercising rights. Whether something is a "penalty" and, if so, to what degree it burdens the exercise of rights depends entirely upon the particular person to whom it is applied. Only to a person needing welfare *and* desiring to move to a new state is a durational residency requirement relating to welfare a "penalty" at all. The extent to which such a requirement is a "penalty," i. e., the degree to which it is burdensome, depends upon the relative intensity of the person's desire to move and his desire to receive the benefit conditioned upon duration of residency.

Under this analysis, the *Shapiro* Court's footnote seems to demonstrate that it was not the mere imposition by the state of the burden of having to make a choice, but the nature of the choice so imposed, that was determinative. Such suggestion is supported by the facts of *Shapiro* where needy families were forced to choose between interstate travel and "the ability . . . to obtain the very means to subsist. . . ."[56] In such circumstances, it was manifest not only that the durational residency requirement was a "penalty," but also that the degree of burden it placed upon those desiring to emigrate was particularly heavy. Viewed in this light, *Shapiro* falls neatly into line with other equal protection cases.[57]

---

56. *Id.* at 627, 89 S.Ct. at 1327.

57. In some cases, the disadvantaged group—those unable to meet the state's condition—can do nothing to become part of the benefitted class, since the state's classification is based upon a criterion over which they have no control. In such cases—for example, those involving classifications based upon race—members of the disadvantaged group are not simply being subjected to the burden of having to make a choice. Indeed, they are *prohibited*, not merely deterred, from receiving a state benefit.

In another type of case, the nature of the criterion forming the basis for classification is such that members of the disadvantaged group can, if they choose to do so, become part of the benefitted class. But, because choosing to become part of the benefitted group entails costs (giving up another benefit), some members of the disadvantaged group may be deterred from making one choice as opposed to the other. In *Harper*, for example, those desiring to vote had only to pay to exercise the franchise. The Court held, however, that a state may not put its citizens to such a choice. An obvious rationale for the Court's decision prohibiting the state from putting its citizens to such a choice is the chance that some persons at least will be deterred from voting. *See* Comment, *supra* note 15, at 120 n. 68.

In *Shapiro*, although the Court was apparently unwilling to raise welfare assistance to "fundamental status," the holding and rationale of the case would logically appear to recognize that forcing needy persons to choose between public assistance and interstate travel is, in effect, to provide no choice at all. To those desperately in need of welfare, moving might well mean starving. So read, the facts of *Shapiro* suggest placing that case within the category of cases, exemplified by those involving racial classification, where the effect of state action is to *prohibit* rather than, as in *Harper* to *deter* the disadvantaged class from becoming part of the benefitted group). The statutory provisions examined in *Shapiro* were thus, in

The above interpellation concerning the rationale of *Shapiro* would indicate that attention must be focused, at this point, upon the nature of the "penalty" imposed by Delaware and the degree to which it burdens the exercise of the right to interstate travel. It might be argued, however, that the Supreme Court has recently cast what may appear to be some doubt on the validity of the analysis advanced here.

In Dunn v. Blumstein, as previously noted,[58] the Court was confronted with the task of determining the constitutionality of Tennessee's voting durational residency laws. After holding that a durational residency requirement upon voting mandated the application of the compelling state interest test because the requirement burdened the fundamental right to vote, the Court asserted:

"This exacting test is appropriate for another reason . . .: Tennessee's durational residence laws classify bona fide residents on the basis of recent travel, penalizing those persons, and only those persons, who have gone from one jurisdiction to another during the qualifying period. Thus, the durational residence requirement directly impinges on the exercise of a second fundamental personal right, the right to travel."[59]

Application of the compelling state interest test was, thus, triggered in *Dunn* both by the statute's effect on the right to vote and by the interstate travel criterion on which the classification, in the Court's view, was based. Significantly, the Court found either ground sufficient to require strict scrutiny.[60]

The Supreme Court also explicitly rejected Tennessee's attempts to distinguish *Shapiro*. Contending that "the vice of the welfare statute in *Shapiro* . . . was its objective to deter interstate travel,"[61] the state urged the Court to apply the compelling interest test only "where there is 'some evidence to indicate a deterrence of or infringement on the right to travel. . . .' "[62] The Court answered: "This view represents a fundamental misunderstanding of the law." [63]

We set aside as untenable the thought that after *Dunn* all durational residency requirements must be examined under the compelling state interest test. To subject *all* such requirements to strict scrutiny without first examining the nature of the benefit conditioned upon duration of residency and the likelihood that interstate travel will be adversely affected would be to stack the deck against state interests.[64] We are aware of very few cases in which the compelling state interest test has been applied and then held by a court to have been satisfied.[65] It is becoming increasingly clear that the mere application of this stringent equal protection test condemns state practices that, although not without merit, simply cannot withstand the heavy burden required for justification. Our view that such a broad reading of *Dunn* must be eschewed is supported by at least two important considerations.

realistic terms, essentially a prohibition of interstate travel and, as such, violated the Constitution. *Cf.* Shapiro v. Thompson, 394 U.S. 618, 659, 661–662, 89 S.Ct. 1322, 22 L.Ed.2d 600 (Harlan, J. dissenting).

58. *See* text accompanying notes 39–41, *supra.*

59. 405 U.S. at 338, 92 S.Ct. at 1001, 31 L.Ed.2d 274.

60. *See* The Supreme Court, 1971 Term, 86 Harv.L.Rev. 1, 105 (1972).

61. 405 U.S. at 339, 92 S.Ct. at 1001.

62. *Id.*

63. *Id.*

64. *See* The Supreme Court, 1971 Term, 86 Harv.L.Rev. 1, 114 (1972).

65. Accord, Dunn v. Blumstein, 405 U.S. 330, 363–364, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (Burger, C. J. dissenting) "seemingly insurmountable standard"). In Hadnott v. Amos, 320 F.Supp. 107 (N.D.Ala.1970) (3-judge court), affd. without opinion, 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971), the Court found compelling state interests to justify a durational residency requirement for judges.

In the first place, the Court in *Dunn* was itself apparently willing to accept a penalty on interstate travel.[66] Tennessee was permitted to require 30 days of pre-election residence. The Court thus recognized that there are instances where lines must be drawn and exceptions made even though interstate travel may be affected.

Second, our disinclination to accept a reading of *Dunn* that would strike down all state statutes "penalizing," no matter how slightly, the right to travel interstate arises from the substantial alteration of federal-state relationships such a reading would portend.[67] Analyzing cases such as *Shapiro, Dunn,* and the present one without regard to the nature of the benefit conditioned by the state and to the likelihood of interstate-travel deterrence might well revive the days of "substantive due process" with the ghost of Lochner v. New York[68] once more stalking the judicial corridors.

In the absence of clearer guidance from the Supreme Court than provided by *Dunn,* we decline so to interpret that case. Instead, *Dunn* should at the present time at least, be read in the context of its facts.[69] Tennessee's statutes forced "a person who wishe[d] to travel and to change residences to choose between travel and the basic right to vote."[70] The status of a "fundamental right" has already been ascribed to voting. Interests in candidacy have not, as yet, received, and in *Bullock* were explicitly denied, such overwhelming protection.

Because such fundamental status has not been accorded candidacy and because the Supreme Court has not held broadly that *all* state-imposed choices between interstate travel and other benefits require application of the compelling interest test, we hold that Delaware's durational residency requirement must be examined under the more flexible, traditional equal protection standard.

66. *See* The Supreme Court, 1971 Term, 86 Harv.L.Rev. 1, 114 (1972). In Fidell v. Board of Elections, 343 F.Supp. 913 (E.D. N.Y.1972) (3-judge court), plaintiffs sought equitable relief requiring defendants to provide for absentee ballots in a New York primary. Since the state provided for absentee voting in general elections, plaintiffs urged that, in denying similar treatment for primary elections, the state violated the equal protection clause and infringed the right to travel as to those required to be out of the state on election day. Requiring only satisfaction of the "rational relation" (traditional) equal protection test, the court upheld New York's action. Although it is clear that, to some extent, the denial of absentee ballots "penalized" the right to travel interstate, the court did not even discuss this issue, although it was raised by plaintiffs. Seeking review by the Supreme Court, plaintiffs reiterated the right-to-travel argument in their jurisdictional statement. The Supreme Court affirmed the lower court's decision without opinion. 409 U.S. 972, 93 S.Ct. 310, 34 L.Ed.2d 236 (1972).

67. *See* The Supreme Court, 1971 Term, 86 Harv.L.Rev. 1, 114–15 (1972).

68. 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). From Lochner, in 1905, to Neb-

bia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), the Supreme Court frequently substituted its judgment for that of legislative bodies regarding the wisdom of regulations. The Court principally relied on the due process clause of the fifth and fourteenth amendments, with occasional resort to the equal protection clause. *Cf.* W. Lockhard, Y. Kamisar and J. Choper, Constitutional Law 461 (3rd ed. 1970). In *Lochner*, Justice Holmes, in his dissenting opinion, stated: ". . . But I do not conceive that to be my duty, because I strongly believe that my agreement or disagreement has nothing to do with the right of a majority to embody their opinions in law. It is settled by various decisions of this court that state constitutions and state laws may regulate life in many ways which we as legislators might think as injudicious, or if you like as tyrannical . . . ." 198 U.S. at 75, 25 S.Ct. at 546. *Cf.* Dandridge v. Williams, 397 U.S. 471, 485–86 (1970).

69. *See* Draper v. Phelps, 351 F.Supp. 677, at 680 (W.D.Okl., filed Sept. 6, 1972) (3-judge court).

70. Dunn v. Blumstein, 405 U.S. 330, 342, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

## II.

The applicable standards for determining the constitutionality of state classifications under the *traditional* equal protection test are well established. State action denies equal protection if "it is without any reasonable basis, and therefore is purely arbitrary."[71] That the state's measure results in some inequality is not controlling since "mathematical nicety" is not required.[72] To be unconstitutional, the state's classification must cause "different treatments . . . so disparate, relative to the difference in classification, as to be wholly arbitrary."[73]

By creating its durational residency requirement, Delaware has attempted to achieve essentially two state objectives: (1) providing the electorate an opportunity to become acquainted with a would-be lawmaker and to observe his intelligence, responsiveness, judgment, sense of responsibility, temperament, character, and other qualities reasonably believed necessary for effective leadership; and (2) insuring that candidates be familiar with the needs and hopes of the state and its citizens. These are both legitimate governmental goals to which the durational residency requirement is rationally related.

First, requiring political aspirants to reside within the state for a given period of time before the election certainly tends to increase the likelihood that voters will thereby become familiar with those desiring to run for office. The fact that Wilmington is served by at least three radio stations, two newspapers of general circulation, and a television station,[74] may suggest that voter familiarity might well be achieved without a durational residency requirement.

But, under the *traditional* equal protection test, choosing among alternatives is a task for the state, not the federal courts. So long as the means employed are rationally related to attainment of the desired objective, under the traditional equal protection text, the Constitution permits the state to choose. Moreover, it would not be unreasonable for Delaware to conclude that the kind of campaign conducted through the mass media is generally inadequate to assure the electorate an opportunity to know the sort of person a potential candidate truly is.

Second, a durational residency requirement tends to increase the probability that potential office-seekers will be exposed to the needs of the state and its citizens. Although a State Representative is elected by the voters in his district, "his acts, as such, affect the entire state."[75] As the defendants here assert: "Though he be elected in Wilmington, he must pass judgment on police protection for Claymont and Seaford, on measures to protect the beach at Rehoboth from erosion, or the shore at Lewes from commercial overdevelopment."[76] The state might reasonably believe that potential candidates will be motivated to become knowledgeable about issues of importance within their particular districts. The power of local voters to elect or reject them provides the incentive. On the other hand, citizens of the state who do not reside within the political aspirant's district but whose lives will be affected by legislative decisions each Representative has a hand in making have no assurance, based upon their voting power, that all members of the legislature will at least be aware of their problems. The durational residency requirement, by providing

71. Lindsley v. National Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911).

72. *Id.*

73. Walters v. City of St. Louis, 347 U.S. 231, 237, 74 S.Ct. 505, 509, 98 L.Ed. 660 (1954) ; *see* Dandridge v. Williams, 397 U.S. 471, 484–486, 90 S.Ct. 1153, 25 L.Ed. 2d 491 (1970).

74. Brief for plaintiff at 5.

75. State ex rel. Biggs v. Corley, 6 W.W. Harr. (36 Del.) 135, 172 A. 415 (1934) (en banc).

76. Brief for Defendants at 15.

that each candidate has resided within the state for a certain period of time, is rationally related to achieving this state objective.

■ Of course, the durational residency requirement, although rationally related to legitimate state goals, produces a classification that is both under-inclusive and overinclusive.[77] Some of the candidates who have satisfied the requirement will be unknown by the voters and will not be familiar with their needs (underinclusive), while some who have not lived within the state for three years will be familiar to the voters and will be aware of their needs (overinclusive). But a state classification is not unconstitutional under the traditional equal protection test merely because it is not "right on target." To comply with the fourteenth amendment, under the traditional test, the state is not required, in designing its classification, to achieve mathematical precision.[78]

Plaintiff has also argued that the three-year durational residency requirement is unreasonably long. "Plaintiff concedes that a residency requirement as such and a durational residency requirement of one year or less are arguably proper."[79] And later, plaintiff asserts: "The sole matter complained of in this action is the unreasonably lengthy residency requirement. . . ."[80] It is unnecessary at this time to determine the point at which a required period of residency becomes unreasonable. We are not, however, on the facts presented in this case, persuaded that Delaware, in view of its asserted state interests, has reached that point.

■ For these reasons, and in light of the relationship of the durational residency requirement to Delaware's legitimate objectives, we hold that the requirement, neither arbitrary nor lacking in rational justification, does not violate the equal protection clause of the fourteenth amendment.

## CONCLUSION

■ Assessing the competing interests presented for reconciliation in this case, we have been mindful that the issue is not so much striking the proper balance as determining *who* should make the adjustment.[81] As non-representative bodies, federal courts do not, and are not designed to, reflect democratic society. Our ability and competence to decide complex legal issues is dependable only within narrow limits.

Our Constitution is not a strait-jacket, nor may we permit it to become one. It has been, and must continue to be, capable of growth and expansion. True, some constitutional mandates are of such universality that variance may not be tolerated. But it is difficult to conceive, however, that a right to run for office *free from durational residency requirements* is such a command. It is because the Constitution possesses the capacity for adaptation that it has endured as the fundamental law of an ever-developing people. And we must exercise care lest that quality be lost.

The durational residency requirement here comes to us stamped with the approval of the voters of Delaware. It is embodied in their state constitution; it erects no racial or wealth classifications; it does not discriminate against discrete minorities incapable of protecting themselves from the whims of an overbearing majority; it is democratically trustworthy.

■ Under these circumstances, our decision reflects, to a great extent, the view that the primary responsibility for balancing the kinds of interests involved here rightfully belongs to the state and its people, subject to a proper scope of judicial review under the tradi-

---

77. *See* Tussman & tenBroek, The Equal Protection of the Laws, 37 Calif.L.Rev. 341, 347–53 (1949).

78. *See* cases cited, note 18, *supra*.

79. Brief for Plaintiff at 6.

80. *Id.* at 27.

81. *Cf.* Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1082–87 (1969).

tional equal protection test. Our role is not that of a "super-legislature." Instead, we confine our judicial power, in cases of this kind, to determining whether the state's asserted interests are legitimate and whether the chosen means are related to the achievement of the state's goal. Having performed this task, we consider our judicial duty to be at an end. Any change in the Delaware Constitution in this regard should come, if at all, from the people of Delaware.

STAPLETON, District Judge (dissenting).

I read Bullock v. Carter[1] and Dunn v. Blumstein[2] to call for application here

of the close scrutiny test. The purpose of Delaware's three year durational residency requirement for Members of the General Assembly is to assure a minimal level of knowledge of the needs and hopes of the State and its people.[3] The state interest involved would justify some durational residency requirement.[4] It will not justify a three year residence requirement since, in the context of present-day Delaware, a substantially less restrictive durational residency requirement would serve the state's interest substantially as well.[5] Accordingly, I would grant the relief sought.

1. 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed. 2d 92 (1972). My interpretation of the *Bullock* case is set forth in Wellford v. Battaglia, 343 F.Supp. 143 (D.Del.1972). In summary, "where the law in question poses an absolute barrier to the candidacy of a not insubstantial segment of the community and, to that degree, limits the voters in their choice of candidates, the more strict standard of review must be applied." Id. at 147. The only statistics available indicate that approximately 15% of Delaware's population in 1970 had moved here from out of state since 1965.

2. 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed. 2d 274 (1972).

  " . . . Tennessee's durational residence laws *classify bona fide residents* on the basis of recent travel, penalizing those persons, and only those persons, who have gone from one jurisdiction to another during the qualifying period. Thus, the durational residence requirement directly impinges on the exercise of a second fundamental personal right, the right to travel.

  * . * * * *

  . . . Tennessee seeks to avoid the clear command of Shapiro by arguing that durational residence requirements for voting neither seek to nor actually do deter such travel. In essence, Tennessee argues that the right to travel is not abridged here in any constitutionally relevant sense.

  This view represents a fundamental misunderstanding of the law. It is irrelevant whether *disenfranchisement or denial of welfare is the more potent deterrent to travel.* Shapiro did not rest

  upon a finding that denial of welfare actually deterred travel. . . .

  * * * * *

  . . . Durational residence laws impermissibly *condition* and *penalize* the right to travel by imposing their prohibitions on only those persons who have recently exercised that right. In the present case, such laws force a person who wishes to travel and change residences to choose between travel and the basic right to vote. Cf. United States v. Jackson, 390 U.S. 570, 582-583 [88 S.Ct. 1209, 1216-1217] 20 L.Ed.2d 138 (1968). Absent a compelling state interest, a State may not burden the right to travel in this way."

3. Another asserted purpose is to provide the electorate with an opportunity to become acquainted with the would-be lawmaker. The electorate, however, so far as would-be representatives are concerned consists of registered voters of his Representative District. The constitutional provision here under attack requires only one year's residence in the Representative District. In this context, I doubt that the requirement of three years' residence in the state was designed to serve the alternative asserted purpose.

4. Compare Hadnot v. Amos, 320 F.Supp. 107 (N.D.Ala.1970) (three judge court), aff'd without opinion, 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971).

5. Dunn v. Blumstein, 405 U.S. 330, 343, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Wellford v. Battaglia, 343 F.Supp. 143 (D.Del.1972).